In re JOHN F. LIPPINCOTT, an infant, et al., petitioners-appellees,

*v.*

JAMES LIPPINCOTT et al., respondents-appellants.

[Argued January term, 1925. Decided March 23, 1925.]

1. In dealing with the custody and control of infants, their welfare and happiness, and not filial affections, is the primary consideration.

2. The natural right of a father to the custody of his child is not an absolute property right, but rather a trust reposed in the father by the state as *parens patriae.*

3. Equity possesses a controlling power over all guardians, and will take an infant from its guardian and deliver it to another whenever the welfare of the infant requires it.

4. The execution of an instrument by a deceased father giving his child, in case of the father's death, to its grandparent, possesses no greater efficacy than a like appointment of a guardian in a last will and testament, and does not prevent the disposition of the custody of the infant according to its best interests.

5. An award of the custody of an orphaned infant, for whom its paternal grandparents had been appointed guardians by its deceased father, to its maternal grandparents for two months of each year, is proper.

On appeal to the court of chancery, advised by Vice-Chancellor Bentley, whose opinion is reported in *96 N. J. Eq. 260.*

*Messrs. Melosh, Morten & Melosh,* for the appellants.

*Mr. Arthur T. Dear,* for the appellees.

The opinion of the court was delivered by

MINTURN, J.

John F. Lippincott, the infant in the case, was born September 7th, 1917. His mother died on February 23d, 1919,

in Brooklyn, New York, where they then resided. Immediately after the mother's death the infant, with his father, came to Jersey City to live with the father's parents, where the infant has resided ever since, with the exception of about a year and a half, during which time the child lived with his father and his father's second wife at Ticonderoga, New York. Clifford E. Lippincott, the father of the infant, died on May 21st, 1923.

On April 30th, 1919, almost four years before his death, Clifford, the father, executed a writing, in which, in case of his death, he delegated to the respondent Elizabeth Lippincott, "the care, custody and nature" of the infant.

On December 31st, 1923, the appellees, who are the maternal grandparents, presented a petition to the court of chancery, praying for the custody of the infant, and to be charged with his care and maintenance, also that a writ of *habeas corpus* issue.

An order thereafter was made requiring the appellants to show cause why a writ of *habeas corpus* should not be awarded, and such other order made respecting the infant's custody, control, maintenance and education as to the court should seem meet.

On March 3d, 1924, the appellants filed an answer admitting the facts herein above stated, averring that they were more competent and able financially to take care of the infant; that the father had executed the writing dated April 30th, 1919, and that it was the wish of the father that the infant should have nothing in common with the appellees.

In their answer the appellants also averred that there was nothing in the petition giving the court of chancery jurisdiction. At the hearing the appellees abandoned the prayer for custody, and the only relief they asked was that the infant be awarded to them for a portion of his time. The court made a decree accordingly, from which this appeal was taken.

No question is presented in the case as to the fitness of either set of grandparents to deal properly with the child. In financial, moral and social capability no criticism is presented as to either, the learned vice-chancellor found none,

and, apparently, the essential inquiry presented is whether, exercising its judgment as *parens patriæ* in behalf of the state, the court of chancery, intent alone upon promoting the best interests of the infant, may in the situation confide his custody for two months of the year to his maternal grand-parents. Were it not for the obvious importance of the legal inquiry involved, comprehending as it does the extent of the chancery jurisdiction in a cause of this character, it were unnecessary to add anything to the very satisfactory opinion of the learned vice-chancellor.

The importance of the inquiry thus presented is accentuated by the fact that no case of like character seems to be presented in our reports. Manifestly, the touchstone of our jurisprudence in matters dealing with the custody and control of infants, is the welfare and happiness of the infant, and not the filial affections naturally arising from parental or family relationship. *Siegel* v. *Hutchinson, 91 N. J. Eq. 328; Slate* v. *Stigale, 22 N. J. Law 286; Wood* v. *Wood, 77 N. J. Eq. 593; Baird* v. *Baird, 18 N. J. Eq. 202.*

Thus, it has been quite generally held that even the natural right of the father to the custody of his child cannot be treated as an absolute property right, but rather as a trust reposed in the father by the state, as *parens patriæ* for the welfare of the infant. *20 R. C. L. 597,* and cases; *In re Moore, 11 Irish C. L. 1; Mercein* v. *People, 25 Wend. 64; Purnilon* v. *Jamrock, 195 Mass. 187.*

Both Dr. Paley in his moral philosophy and Chancellor Kent emphasize this as the primal consideration in morals, as well as in law. *1 Paley Moral Phil. 221; 2 Kent. Com. 203.*

Greece, Egypt, Persia and the ancient civilizations generally, according to the historian Tytler, considered the child as a charge of the state, which, after early infancy, took the child into its control and educated him throughout youth, in the manners, customs, traditions and laws of the state. emphasizing in the curriculum loyalty to the state, as the first consideration from the child. Thus, says Aristotle in his "Politics," "it is an axiom that the best laws, though sanctioned by every citizen of the state, will be of no avail, unless

the young are trained by habit and education in the spirit of the constitution."

The early Roman law, on the other hand, conceded to the father absolute dominion over the child, including the power of death, as a corrective. This arbitrary and unlimited power was afterwards modified by the state in the interest of the humanities, so that, in the days of later emperors, a father was banished from the empire for having killed his son. *1 Bl. Com. 451.*

The English common law, in the light of these extreme policies, presented a composite system, which, within reasonable limitations, conceded to the parent absolute control, subject to the power of the king, as *parens patriæ*, to control the infantile status in the interest of the child, as well as in the interest of the state. *1 Bl. Com, supra.*

This power in England was at times taken over by the state absolutely, as in ancient Greece, by various parliamentary enactments, during the continuance of the various religious hallucinations of the seventeenth and eighteenth centuries, when the children of one denomination were forcibly taken from their parents for the purpose of inculcating a denominational religious education, which was presumed to be in harmony with the policy of the reigning dynasty as opposed to the policy of a supposed foreign domination. These obnoxious enactments continued upon the British statute books until the political enlightenment attendant upon the American revolution, concerning popular rights, succeeded in the reign of George IV (chapter 7) in repealing them. *1 Sharsw. Bl. 452.* These enactments stand, however, as a legal epoch evincing the power of the state, when deemed necessary to its political policy and safety, to intervene as *parens patriæ,* by assuming the Spartan role of absolute possession of the infant in the interest of the state.

The cases in this country, illustrative of the exercise of this general power in behalf of the infant, are supplied in the main by the early chancery jurisdiction of New York, when the learning of Chancellors Kent, Walworth and Livingston lent additional emphasis to the adjudications. Thus,

says Chancellor Kent: "This court has the care and protection of infants during their minority." *1 Johns. Ch. 25.*

And, says Chancellor Walworth in *People* v. *Mercein:* "The power of the court to intervene for the protection of the infant was not the creature of statute, but is an inherent power in the court derived from the common law." *8 Paige Ch. 55.*

So, in *Mercein* v. *People, 25 Wend. 106,* Chancellor Walworth sitting, it was declared by the New York court of errors, that "upon a review of all the authorities bearing upon the courts of this state, I have come to the conclusion that the right of the father to the custody of his child is not absolute, and that such custody is referrable to its interest and welfare, and is to be exercised by the court in the exercise of a sound judicial discretion, irrespective of the claims of either parent. This conclusion, I believe, is warranted by the law of this state as well as by the law of nature. A sense of parental duty ought even to withhold a parent from pressing his or her claims to the custody of a child wherever the true interests of such child forbid it, and whenever the parental obligation fails to influence the conduct of the parent, it is fortunate that the enlightened principles of our law authorize our courts to interpose in behalf of the child."

In pursuance of this equitable philosophy, the rule has been quite generally declared that "equity possess a controlling and superintending power over all guardians, including testamentary and those appointed by the surrogate, and will take the infant from the guardian and deliver it to another whenever the welfare of the infant requires it." *People* v. *Wilcox, 22 Barb. 178; Disbrow* v. *Henshaw, 8 Cow. 350; In re Wollstonecraft, 4 Johns. Ch. 80; Fisher* v. *Meader, 95 N. J. Law 59; 2 Kent Com. 205; 3 Pom. Eq. Jur. 1304.*

Manifestly, therefore, even though the father, in this instance, executed an instrument in writing, assigning the child to the paternal grandmother, under the provisions of our statute concerning guardians (*2 Comp. Stat. p. 2627*), which is but a replica of the English statute of *12 Car. II ch.*

*24,* such instrument can possess no greater efficacy than a like appointment contained in a last will and testament, when the manifest interest of the child presents the material and only ground for judicial interposition.

For the purpose of making this temporary change of custody from one grandparent to another, the child, in this instance, was actually in court, and within the jurisdiction.

The only inquiry therefore before the learned vice-chancellor was as to how the best interests of the infant could be subserved, and we think his disposition of the matter was equitable and correct. That it will be for the material and moral interests of the child in its parental isolation to know and enjoy the affection and love of its mother's people will be conceded by all who are so fortunate as to be able to revive the delectable memories of a youth so placed.

The situation thus presented is not without its consoling compensation, for, as if by an ordinance of nature, the companionship of parental old age brings to the confiding nature of roseate youth the balmy benediction of an expiring day, the mellow and indelible memories of a family recessional.

The decree will be affirmed.

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, MINTURN, BLACK, KATZENBACH, LLOYD, GARDNER, VAN BUSKIRK, CLARK, McGLENNON, KAYS, JJ. 11.

*For reversal*—PARKER, J. 1.