The petitioner, as the father of Alice Rose Elizabeth Pfahler, an infant of the age of five years, seeks by means of a habeascorpus to compel Sarah Bennett, the child's maternal *Page 162 
grandmother, who has the custody of said child, to restore her to her father. The petitioner was married July 31st, 1921, to Mabel Alice Lockman, and lived with his wife in Bayonne, New Jersey. Two children were born of the marriage. The petitioner's wife died June 5th, 1923. For a time prior to his wife's death, and because of her illness, the petitioner's two children were entrusted to the care of the respondent, who resided at Cranford, New Jersey. The petitioner was a working man and had no means of caring for his children in his own home. About a month after his wife's death he went to live in a boarding house, and continued so to live up to the time of his remarriage, October 25th, 1924, to his present wife, Lillian Adele Pfahler. About three days after his first wife's funeral the petitioner took one of his children from the home of the respondent to the home of his mother, in Pennsylvania, who has since had the custody of said child. The other child, Alice Pfahler, continued to remain in the custody of the respondent.
I am convinced by the proofs, notwithstanding the denial of the petitioner to the contrary, that he is content to allow his daughter Delphine to continue in the custody of the mother. He has made no effort to regain the custody of his daughter Delphine. He says that shortly after his first wife's death he several times endeavored to persuade the respondent to restore his daughter Alice to him, although he had no home to bring her to other than the boarding houses in which he resided. It is apparent from the proofs that the petitioner manifested little regard for the society of either of his children, and that he was content to allow their respective custodians to have full custody thereof. It is manifest to me, notwithstanding the denial of the petitioner to the contrary, that he very infrequently called to see his daughter Alice, and was indifferent as to her welfare. The respondent testified that the petitioner's father stated to her, in the petitioner's presence, when they visited the home of the respondent at Christmas time, 1925, that the petitioner would not then have visited the respondent's home to see his daughter Alice if he, the petitioner's father, had not made him do so. This was not denied by the petitioner or his father. *Page 163 
It appears from the testimony of the respondents (and I am convinced as to the truth thereof) that when the petitioner, shortly after his wife's death, talked with respondent about delivering up to him the custody of his daughter Alice, he agreed with her that if she would resume her residence in the city of Bayonne he would be content to permit his child to continue in her custody; and the respondent, relying upon the petitioner's assurance in this respect, removed from Cranford to Bayonne. While I appreciate that this agreement is insufficient in law to deprive the father of the right to the custody of his child, nevertheless he manifested his willingness to abandon her to the care and custody of the respondent.
There is no proof in the case which indicates that the respondent has at any time said or done anything which would tend to wean the child's love and affection from her father. The respondent testified that the petitioner did not visit her home from the visitation which he made in the company of his father at Christmas time, 1925, until February, 1927 — shortly before the commencement of this proceeding. His absence from and non-communication with his said child for so long a period of time do not, in my judgment, jibe with his present protestations of sincerity in seeking her custody. The child enjoys a very comfortable home with the respondent, and is beloved by not only the respondent, but by her husband and other members of her household. The respondent's home is situate not far distant from the home of the petitioner in the city of Bayonne.
Disregarding, however, for the purpose of my determination of this matter, the conversations and undertakings between the petitioner and the respondent with respect to the custody of said child, I am convinced that it would not be for the best interests of the child that she be taken from the custody of the respondent and delivered over to the custody of the petitioner. While nothing has been urged in this proceeding against the fitness of the petitioner to properly care for his child, it is manifest to me that if said child were delivered over to him the environment in which she would be brought up would be subversive of her welfare and *Page 164 
best interests. The proofs disclose that the petitioner's present wife had entrusted to her care for a short time, by a friend, a little boy between the age of four and five years, whom, on one occasion, she took with her to the home of a neighbor where she remained until about midnight, during which time she was smoking cigarettes and drinking alcoholic beverages to excess. One of the persons with her on said occasion (Mabel Hunter) testified that she, the petitioner's wife, indulged in drinking to such an extent that she became intoxicated. The petitioner's wife, while admitting she indulged in the drinking of intoxicating beverages on said occasion, says she did not drink to excess. When interrogated by me as to what she meant by "to excess," she replied, "Well, so as not to know what I am doing; I didn't drink like that." When counsel for the respondent asked her, "How much did you have?" she replied, "Well, I never counted them; probably three or four glasses of wine." She admitted also that she drank wine in her home occasionally, sometimes with her meals, and occasionally with a neighbor who visited her. The proofs indicate goings-on in the neighbor's home which the petitioner's wife visited on the occasion aforesaid, savoring of misconduct between a man and woman there present. This, apparently, was the occasion referred to by John McGeehan, a nephew of the respondent, who testified that on one occasion, in the night-time, he and a cousin (whom he named) observed, by looking through a window of the house of Mrs. Wymans, with whom Mr. Pfahler boarded, the petitioner's wife (who was not then married to the petitioner) "smoking and pulling at a bottle of whiskey, and there was a couple of men in there, too, I don't know who they were, and they were drinking together." His testimony, in this respect, has reference to an incident in the home of Mrs. Wymans, with whom the petitioner then boarded, but at a time when the petitioner was not present. The petitioner's wife was apparently not surprised by said testimony. She testified that the occasion referred to was prior to her marriage to the petitioner. She was asked by counsel for the respondent, on cross-examination, whether there was another young woman in the room with her while she was in the house referred to by Mr. *Page 165 
McGeehan, and she replied, "Yes, there was another young woman there." She was then asked, "And the fact was that she was not acting properly, wasn't it?" and Mrs. Pfahler replied, "Well, she got up and went out of the room." She was then asked, "I don't want to know what it was, but, in your presence, she was not acting properly?" and Mrs. Pfahler replied, "In my presence she was acting all right, but it was when they went out of the room they saw these things in the window." It appears manifest to me, from the testimony, that the man and woman referred to had, to the knowledge of the petitioner's said wife, misconducted themselves in said apartment, yet she, the petitioner's wife, thereafter continued her companionship with said woman for a considerable time. It appears that the parties were married thereafter.
The petitioner's wife testified that after she was married to the petitioner they (the parties referred to) told her what happened on that occasion.
Notwithstanding that it was disclosed on the cross-examination of Mabel Hunter that she was the mother of a child born out of wedlock, I was favorably impressed with the manifest sincerity and truthfulness of her testimony, which reflected discreditably upon the behavior and morals of the petitioner's wife. Miss Hunter testified that the petitioner's wife, on several occasions, to her knowledge, visited the same neighbor's home hereinabove referred to, and remained there carousing and carrying on in a manner discreditable to her — on one occasion from nine o'clock at night until one-thirty o'clock the following morning, during which time she, the petitioner's wife, consumed alcoholic beverages and smoked cigarettes. Miss Hunter testified also that on one of the occasions when the petitioner visited the home of her said neighbor she was accompanied by two children who had been entrusted to her care by a friend, that one of the children cried, and Mrs. Pfahler violently laid hands upon said child and slammed it into a chair, at the same time saying she was "sick and tired of the kid, and was going to send it home." Miss Hunter not only testified that the petitioner's wife was accustomed to drink beer, wine and whiskey, but that she was *Page 166 
drunk on at least one occasion. The only testimony offered to refute the testimony of Miss Hunter (other than the testimony of the petitioner's wife) was that of Edward Manning, in whose home the "parties" hereinabove referred to were had by the petitioner's wife and others. Mr. Manning was interrogated as to whether Mrs. Pfahler was ever drunk in his home, and he says, "No, she was never drunk in my home, to my knowledge." He was then asked, "Did Mrs. Pfahler ever drink in your home?" and he replied, "I don't say she didn't drink, and might have had a little wine." I asked him whether she might have taken half a dozen glasses, and he replied, "Well, she might, but I don't recall it." He was then asked, "Then you don't know how much she did have?" and he replied, "No, I wouldn't be watching Mrs. Pfahler." It is manifest, from the testimony of this witness, that he could not know what was going on in his home at times when the petitioner's wife and others were there, when he was away at his work. It is significant that Mrs. Manning was not called as a witness to refute the testimony of Miss Hunter as to the goings-on in her home on the occasions alluded to by said witness. No explanation was offered by counsel for the petitioner as to Mrs. Manning's failure to appear as a witness in the proceedings. Mr. Manning acknowledged that on at least two occasions when he returned from his work — about eleven o'clock at night — Mrs. Pfahler was at his home with the children of her friend, whom she was taking care of.
Aside from the fact that the petitioner's wife, in my judgment, is an unfit person to whom to entrust the petitioner's child (and it is apparent that the child would be entrusted to her care while the petitioner would be away to his work) it appears, from the testimony of Mrs. Pfahler herself, that she, for some years past, has suffered ill health, and that it was only a few months prior to the commencement of these proceedings that her health would permit her to assume the care of the petitioner's child.
Where, as in the case sub judice, the father has, by his conduct, evinced an apparent intention of relinquishing the care and custody of his child to the child's maternal grandmother, and in consequence thereof the child has formed new ties and *Page 167 
entered upon a new station in life, so that the resumption by the father of his custody of the child would seriously jeopardize the child's happiness and welfare, and the environment to which the child would, while in the care of the petitioner's wife, be subjected, would be inimical to the child's best interests and general welfare, such custody should not be restored to him.
It has been repeatedly held that the legal right of the father to the custody of a child cannot be disregarded without justifiable cause. But that right must be held in subordination to and exercised in consistency with the rights, the moral training, and the highest welfare of the child. See Albert v.Perry, 14 N.J. Eq. 542; Winans v. Luppie, 47 N.J. Eq. 302.
All of the cases indicate that "the highest welfare of the child" should be the concern of the court.
In Richards v. Collins, 45 N.J. Eq. 283, it was held that the strict legal right of the father to the custody of his child will not prevail, if it imperils the personal safety, morals, health or happiness of the child, and that the court will scrutinize the character, condition, habits and other surroundings of the father.
The respondent would doubtless be obliged to yield to the superior and natural right of the petitioner, unless thereby the well-being of the child would be jeopardized. The reported cases indicate that the parent's right will not be denied unless the foster alliance was protracted and acquiesced in in a spirit of abandonment, and a severance will be disadvantageous to the child. Such conditions I regard as manifest in the case subjudice. In In re Judge, 91 N.J. Eq. 395, citing Richards v.Collins, supra, the court says: "The infant's welfare, all matters considered, is paramount and compelling in the eyes of the chancellor as parens patria. The parental right, however, is never lost sight of as an influential and determining factor * * *. The strict legal right will not be subordinated unless circumstances of weight and importance connected with the welfare of the child exist to overpower it, and those circumstances must be such as to imperil the personal safety, morals, health or happiness of the child."
In Lippincott v. Lippincott, 97 N.J. Eq. 517, 519, the *Page 168 
court says: "Manifestly, the touchstone of our jurisprudence in matters dealing with the custody and control of infants, is the welfare and happiness of the infants, and not the filial affections naturally arising from parental or family relationship. Ziezel v. Hutchinson, 91 N.J. Eq. 328; State v.Stigall, 22 N.J. Law 286; Wood v. Wood, 77 N.J. Eq. 593;Baird v. Baird, 18 N.J. Eq. 202. Thus, it has been quite generally held that even the natural right of the father to the custody of his child cannot be treated as an absolute property right, but rather as a trust reposed in the father by the state, as parens patria for the welfare of the infant."
I will advise an order denying the petitioner's prayer, but, in order to avoid any misunderstanding as to the relative rights of the petitioner and respondent to the custody of the child in question, and the denial of the petitioner's prayer for custody of the said child, it must be borne in mind that the present adjudication relates only to present conditions. The petitioner, as the father of the child, is merely denied the right to, at this time, be awarded the custody of the child, because of the environment which, in my judgment, would surround the child if it were to be entrusted to the care of the petitioner's wife, which must necessarily follow if awarded to the petitioner, during the time, at least, when the petitioner is away from his home. As was said in Kopcinski v. Richardson, 94 Atl. Rep. 32 (at p. 34
— Vice-Chancellor Leaming): "As father of the child it is his right to retain and foster the love and esteem of his child and to enjoy her society at all reasonable times. It is, in like manner, the duty of the defendant to teach the child to love and respect her father and to allow the father the fullest possible privileges for the enjoyment of the society of his child; any failure of this duty upon the part of defendant may be made the basis of future relief on his part."
The order denying the petitioner's prayer for the custody of his aforesaid daughter, which, in effect, will continue the child in the custody of the respondent, the child's maternal grandmother, shall provide for the right of visitation by the father at certain intervals, which may be agreed upon between the petitioner and the respondent to suit their respective convenience; *Page 169 
and if they fail to agree in regard thereto, the court will designate the times and places when and where the father shall be privileged to see his child and enjoy her society. The order shall also provide that the father and the respondent be enjoined not to take, nor permit to be taken, the aforesaid child out of the jurisdiction of this court without the consent, in writing, of both parties therefor, or without an order of this court first had and obtained therefor. Following the procedure adopted in the case of Cole v. Cole, 89 N.J. Eq. (at p. 382), the order shall be so drafted that a disobedience of it will constitute a crime committed within this state, so that any person alleged to be guilty may be extradited. Counsel, in drawing such order, should have regard to the case of State v. Dudley,89 N.J. Law 42, and to the form in which the statutes providing for the crime of desertion are drawn. The order shall also provide that no counsel fee or costs be allowed to either of the parties in this proceeding.