Essex County Juvenile and Domestic Relations Court.

HELEN STEPHENS, OF THE BOARD OF EDUCATION OF THE TOWN OF WEST ORANGE, COMPLAINANT, v. BENNO BONGART AND GERTRUDE BONGART, DEFENDANTS.

Decided January 5, 1937.

For the complainant, *Norman L. Brundage.*

For the defendants, *Carl A. Quaglia.*

SIEGLER, Judge.   Helen Stephens, attendance officer of the school district of the town of West Orange in the county of Essex, filed her complaint against Gertrude R. Bongart and Benno Bongart, the defendants in this action, charging that they reside within the school district of the town of West Orange, and being the parents and having custody and control of William Bongart, aged twelve, and Robert Bongart, aged eleven, their children, have, since the 5th day of April, 1936, failed to cause their said children regularly to attend the public schools of the school district of the said town of West Orange; further charging said defendants having neither caused said children to attend a day school in which there is given instruction equivalent to that provided in the public schools for children of similar grades and attainments, nor have they received equivalent instruction elsewhere than at school, contrary to the provisions of

an act of the legislature of the State of New Jersey entitled, "An act to establish a thorough and efficient system of free public schools and to provide for the maintenance, support and management thereof," approved October 19th, one thousand nine hundred and three, and the amendments thereof and supplements thereto.

The act upon which these proceedings are based, chapter 307 of the laws of 1931 (*N. J. Stat. Annual* 1931, § 185-165c), reads as follows:

"Every parent, guardian or other person having custody and control of a child between the ages of seven and sixteen years shall cause such child regularly to attend the public schools of such district or to attend a day school in which there is given instruction equivalent to that provided in the public schools for children of similar grades and attainments or to receive equivalent instruction elsewhere than at school unless such child is above the age of fourteen years. * * * Such regular attendance shall be during all the days and hours that the public schools are in session in said school district, unless it shall be shown to the satisfaction of the board of education of said school district that the mental condition of such child is such that he or she cannot benefit from instruction in the school or that the bodily condition of the child is such as to prevent his or her attendance at school; * * *."

The legislature has conferred power and authority upon this court to hear and determine issues condemned by the aforesaid legislation by chapter 34 of the laws of 1919, pages 69-70, approved April 7th, 1919. *Cum. Supp. Comp. Stat.* 1911-1924, *p.* 3219, § 185-165v.

The first point raised by the defendants is that the statute under which these proceedings are brought; to wit, chapter 307 of the laws of 1931, is invalid because it invades the fourteenth amendment of the United States constitution. The problem for determination is whether the statute, as construed and applied, unreasonably infringes the liberty guaranteed to the defendants by the fourteenth amendment: "No State shall * * * deprive any person of life, liberty, or property without due process of law." This statute is a

legitimate exercise of the police power of the state. The object of the legislation was to create an enlightened American citizenship in sympathy with our principles and ideals, and to prevent children reared in America from remaining ignorant and illiterate. If it is within the police power of the state to regulate wages, to legislate respecting housing conditions in crowded cities, to prohibit dark rooms in tenement houses, to compel landlords to place windows in their tenements which will enable their tenants to enjoy the sunshine, it is within the police power of the state to compel every resident of New Jersey so to educate his children that the light of American ideals will permeate the life of our future citizens. Police power itself is an attribute of sovereignty. It exists without any reservation in the constitution. It is founded on the right of the state to protect its citizens, provide for their welfare and progress, and to insure the good of society. It corresponds to the right of self-preservation in the individual. Its application varies with the exigencies of the situation and with the progress of mankind. It is the foundation of our social system, and upon it depends the securing of social order, the life and health of the citizen, the comfort of existence, the enjoyment of private and social life, and the beneficial use of property. It extends to the protection of life, health, comfort, and welfare of persons, the protection of property, and to the welfare of the state itself. All natural persons within the jurisdiction hold their property and pursue their various callings subject to the police power. It is inherent in the various states of the union, as well as in the federal government. It extends to regulation of education; for the very existence of our government, as well as its progress and development, depend upon the intelligence of our citizenry. *McLean* v. *Arkansas,* 211 *U. S.* 539; *Muller* v. *Oregon,* 208 *Id.* 412; *Holden* v. *Hardy,* 169 *Id.* 366; *Jacobson* v. *Massachusetts,* 197 *Id.* 11.

The defendants rely upon the authority of *Meyer* v. *Nebraska,* 262 *U. S.* 390, and *Pierce* v. *Society of Sisters,* and *Pierce* v. *Hill Military Academy,* 268 *Id.* 510, for support of their contention that the legislation under considera-

tion is unconstitutional. The issue in the Pierce case, *supra,* was not that involved here. There the court was considering property rights of the appellees; the right to engage in the business of conducting a school for the instruction of children; but throughout the whole case the question of the right of the state to require children to attend school was not challenged; this right appeared to be conceded.

The court states, in that case, (at *p.* 534) :

"No question is raised concerning the power of the State reasonably to regulate all schools, to inspect, supervise and examine them, their teachers and pupils; *to require that all children of proper age attend some school,* that teachers shall be of good moral character and patriotic disposition, that certain studies plainly essential to good citizenship must be taught, and that nothing be taught which is manifestly inimical to the public welfare." (Italics mine.)

In *Meyer* v. *Nebraska, supra,* the court was concerned with a prohibition against teaching the German language to children under fourteen unless they had completed eighth grade work, and did not touch the question of the power of the state to compel education. It dealt with the right of the teacher to practice his profession, which was regarded as a property right. The question had no relation to the power of the state to compel education of the children and the duty of the parent to see to it that the children received education. The United States Supreme Court, speaking through Mr. Justice McReynolds (at *p.* 402), said:

"The power of the state to compel attendance at some school and to make reasonable regulations for all schools, including a requirement that they shall give instruction in English, is not questioned. Nor has challenge been made of the state's power to prescribe a curriculum for institutions which it supports. These matters are not within the present controversy."

See 24 *R. C. L.* 558, 559, and 24 *R. C. L.* 621; *State* v. *Jackson,* 71 *N. H.* 552; 60 *L. R. A.* 739; *Parr* v. *State,* 157 *N. W.* 555 (at *p.* 556).

In the case of *State* v. *Williams,* 228 *N. W. Rep.* 470, the court dealt with precisely the same type of legislation that is

here considered. There, too, the constitutionality of the act was questioned, and the court squarely put at rest this problem when it said:

"What the state has a right to demand and all that is demanded by the South Dakota law is that normal children of school age attend some school, or that he be instructed by a competent instructor, and that 'teachers shall be of good moral character and patriotic disposition, that certain studies plainly essential to good citizenship must be taught, and that nothing be taught which is manifestly inimical to the public welfare.' *Pierce* v. *Society of Sisters, supra.* The South Dakota law is well within this doctrine."

In *State* v. *Hoyt* (*N. H.*), 146 *Atl. Rep.* 170, in dealing with the constitutional validity of the compulsory attendance statute, in substance like the statute in New Jersey, Chief Justice Peaslee said (at *p.* 170):

"The constitutionality of the compulsory school attendance statute * * * has not been considered to be an open question in this state. *State* v. *Jackson,* 71 *N. H.* 552; 53 *Atl. Rep.* 1021; 60 *L. R. A.* 739. 'Free schooling furnished by the state is not so much a right granted to pupils as a duty imposed upon them for the public good. If they do not voluntarily attend the schools provided for them, they may be compelled to do so.' *Fogg* v. *Board of Education,* 76 *N. H.* 296, 299; 82 *Atl. Rep.* 173." * * * "The defendants' claim that the federal guaranty of liberty enables them to set at defiance any attempt of the state to prescribe the means for ascertaining the sufficiency of educational facilities furnished and to be furnished as a substitute for the public school, goes far beyond anything that has been decided to be the law." *Ibid.,* 171.

"The importance of the inquiry thus presented is accentuated by the fact that no case of like character seems to be presented in our reports. Manifestly, the touchstone of our jurisprudence in matters dealing with custody and control of infants is the welfare and happiness of the infant. * * * Thus, it has been quite generally held that even the natural right of the father to the custody of his child cannot be treated as an absolute property right, but rather as a trust

reposed in the father by the state, as *parens patriæ* for the welfare of the infant." *Lippincott* v. *Lippincott,* 97 *N. J. Eq.* 517; 128 *Atl. Rep.* 254, 255. See, also, *Ex parte Pfahler (Court of Chancery),* 102 *N. J. Eq.* 161; 139 *Atl. Rep.* 906; *Price* v. *Sainsot (Court of Errors and Appeals),* 103 *N. J. Eq.* 355; 143 *Atl. Rep.* 319; *Hope* v. *Brown (Court of Chancery),* 128 *Atl. Rep.* 851, 852; *Ziezel* v. *Hutchinson (Court of Errors and Appeals),* 91 *N. J. Eq.* 325; 109 *Atl. Rep.* 300.

It is a rule of law that a statute will not be declared to be unconstitutional—particularly by a trial court—unless its invalidity is so manifest and clear as to leave no room for reasonable doubt. *Sexton* v. *Newark District Telegraph Co.,* 84 *N. J. L.* 85; 86 *Atl. Rep.* 451; *O'Gorman & Young* v. *Phoenix Assurance Co.,* 105 *N. J. L.* 642 (at *p.* 645); 146 *Atl. Rep.* 370; *McCarthy* v. *Walter,* 107 *N. J. L.* 223; 152 *Atl. Rep.* 175. Additional authorities might be cited in support of this proposition, but I regard the constitutionality of this law as so well established that other citation is unnecessary. This act not contravening the constitution, is held, therefore, to be a valid exercise of the police powers of the state.

The second point for determination is whether or not the defendants provided instruction for their children equivalent to that provided in the public schools for children of similar grades and attainments.

This necessitates an analysis of the testimony. The proof is that the defendants' children, William, twelve, and Robert, eleven, were in the sixth and fifth grades, respectively, in the Washington Street School, West Orange, until April 3d, 1936. From that date, these children failed to attend a public or day school, although proper notice was served upon the defendants to return the children to a school. The defendants admit they caused the children's withdrawal from the Washington School.

Since that time, the defendants claim that they instructed their children in their own home in the subjects taught in the fifth and sixth grades. This instruction, they claim, is equivalent to that provided in the public schools for children

of similar grades and attainments. The case turns on this factual situation.

*Words and Phrases* defines the word *equivalent* as follows:

"*Equivalent* means equal in worth or value, force, power, effect, import, and the like." Citing *McLean* v. *Moran,* 99 *Pac. Rep.* 836, 837; 38 *Mont.* 298.

Quite definitely, the term refers to the giving of instruction equal in value and effect to that given in a public school. In determining this question, consideration must be given, first, to the matter of the ability of the parents to provide equivalent instruction, and, secondly, to a comparison of the quality, character, and methods of teaching employed by the defendants and that of the West Orange public school system. Mrs. Bongart was graduated from the Eastern District High School, New York City, in 1911. In 1917 she was a special student at Hunter College, evening course. This required three or four evenings a week, which she carried on for only two years. She studied economics, psychology, art, portrait work, charcoal work and painting; she majored in home economics. Mrs. Bongart had no teaching experience. She was married about fifteen years ago, and her chief employment was that of housewife. Mr. Bongart is a graduate of the University of Strassbourg, in the field of electrical and mechanical engineering. He never trained for teaching, but did have employment as a teacher at the New York Aerial School, Newark Technical School and the Newark Junior High School until recently. He taught subjects in mechanical drawing and electrical engineering. The teachers in the elementary grades of the public schools, particularly the fifth and sixth grades in the West Orange school system, must have at least a high school education and three years at an approved normal school in the State of New Jersey.

The normal school curriculum includes a type of training and education intended to qualify students to teach in the elementary class in the subjects of English, history, science, sociology, civics, mathematics, hygiene, geography, art, music and physical education. The major aim is to give the teachers training in techniques of presentation of material to elementary school students. That involves the proper selection of

material, knowledge of children, and the organization of their work, so that every teacher should know the results which must be achieved in terms of knowledge, habits, skills attitudes, and appreciations. Her training should qualify her to develop individuality and the personality of each child under her supervision. One of the major aims of our public school to-day is to teach the way in which the individual must fit into the social group. The evidence establishes that the teachers in the fifth and sixth grades of Washington School possess this training and qualify in these courses.

It is clear, upon comparison, that there is a substantial variance between the training, qualifications, and experience of the defendants and those obtaining in the public school system of West Orange.

Now, what was the instruction given by the defendants at their home? The children assemble, one in the dining room and the other in the front room, each morning at nine o'clock, and continue until twelve; they resume at one o'clock, and recess at three o'clock in the afternoon. They receive instruction in arithmetic, spelling, history, geography, language and music. In the evening, the father instructs them in science between seven and nine o'clock.

In the study of arithmetic a textbook is used by Stone and Millis, dated 1914. There were no textbooks for spelling, language, music, civics, hygiene and art; while the textbooks used were outmoded and outdated, the latest published in 1921 and the oldest in 1881, and all certainly of questionable value in the instruction of children. Spelling was taught without a book, the mother giving twenty words at random each week, which the children had to learn and place in a notebook. The other subjects were taught by assigning periods of thirty or thirty-five minutes for each. Language was largely taught through the reading of the newspapers, the *Literary Digest* and the *Saturday Evening Post*. Poetry was principally taught by the use of an occasional piece of poetry out of the *Sunday Times* and the *New York Daily News,* a tabloid newspaper. No poems were memorized. Music was taught by listening to radio concerts. There were no song books or singing exercises. Mechanical drawing and current

events were given by the father in the evening. The *Newark Evening News* and some other periodicals were sources from which current events were drawn for discussion. The Bible was read once in a while. The flag of the country was exhibited in front of the house on patriotic occasions. The mother spoke to them about hygiene and the danger of alcoholic beverages, but no hygiene textbook was used. There were no instructions in observance of patriotic holidays, and no observance of Arbor Day. There was no physical training except that which they got outside in the ordinary course of their play. They had membership in the Y. M. C. A., but failed to attend during September and October. Of this default the parents had no knowledge.

The instruction was interrupted from time to time by the mother's household duties, occasional shopping tours, and house callers. The defendants had no definite schedule for daily instruction. The evidence indicates that the boys obtained from children in school, periodically, information as to the subjects they were studying in school, and transmitted that information to the mother, who guided herself in instrucing the children, to some extent, by it. They had no marks for their work. There were no daily work papers, tests, or examinations; at least, there were none presented in evidence. In fact, the mother admits she had no standard by which to determine whether the children were absorbing the instruction she was attempting to give. There was no organized supervision over the teaching that the defendants gave; the work of the children, and the results accomplished, were never submitted to any other competent authority for supervision, criticism, or approval.

A summary of the methods of instruction at the Washington School of West Orange will be useful for comparative purposes. The elementary grades are supervised by a specially trained person, who has complete supervision over the courses of study, the textbooks used, and the methods employed by the teachers in transmitting knowledge and the building and developing of the personalities of the children. The school is organized as a miniature community center, a sort of city, where each child considers himself a citizen, with duties

toward the community as is required on the outside. The eduational structure thus developed is in the nature of a group enterprise, where the children work together for the common good. The teacher creates the atmosphere and becomes the guiding influence. A high discipline is maintained by strict attention to the development of habits, skills and attitudes. There is group discussion. The children bring in articles from the outside. They study the biographies of great men, and discuss their achievements. In the fifth and sixth grades, reading, writing, spelling, arithmetic, English, history, geography, civics, hygiene, safety education, music, art and penmanship are taught. The children are taught to use the dictionary. The norm for instruction may be found in several monographs on each subject, provided by the state board of education, and strict adherence is required. In the fifth grade, there are seven textbooks in daily use to cover the subjects. In the sixth grade, there are also seven textbooks, supplemented by thirteen reference and reading books used in connection with their courses, and, in addition, the school library is available to them. Every text, reading, and reference book, twenty-six in number, produced in evidence, is carefully selected in accordance with the regulations of the state board of education and approved by the supervisor of the elementary grades and by the board of education of West Orange. There is a student schedule for the fifth and sixth grades, which provides for instruction from eighty-forty-five A. M. until three P. M. from Monday to Friday, inclusive. The curriculum provides for instruction in the development of abilities, habits and skills. Instruction is also given by way of travel lectures, picture studies, art and music, so that every child has something to talk about. Thus, an audience situation is created for the children, where each child is required to rise and speak to the entire group. This creates self-confidence, and tends to adjust the child to the social group.

One poem a week, and appreciation for the beauties of nature and literature are taught. Beside teaching arithmetic from texts, they instruct in practical matters requiring arithmetic. Geography is taught to meet life situations by creating interest in world travel and training the children to vis-

ualize, in their reading, places that they have studied. In music, each child is allowed to develop whatever talent he may possess. In art, each child learns the harmony of color in dress, interior decoration, and every-day life. Every morning the children have a reading from the Bible and recite the Lord's Prayer. They salute the flag and sing patriotic songs. They observe Arbor Day and all patriotic holidays. A course in safety education and fire prevention is pursued. The month of June is devoted to review. They have physical education four periods each week under a special supervisor. In the civics course, the children are on the lookout for all material in current events. There are three school magazines. Washington School has a monthly newspaper, and all children are eligible to participate in its columns.

The textbooks used by the defendants are nine in number, and are as follows: *Old Times in the Colonies,* by Charles Carleton Coffin, 1881; an arithmetic book by Stone and Millis, 1914; *A Manual of Child Development,* 1927; *The Home Kindergarten Manual,* 1921 (2 volumes); *How to Teach American History,* by Wayland, 1914; Rabenort's *Geography,* 1921; *American History,* by Muzzey, 1911; *The Teacher-Parent Guide to Character Building,* 1926.

From this comparison and analysis of the evidence, I find (1) that the education, training, and equipment of the defendants are substantially inadequate, as compared with those of the public school teacher; (2) that the schedule of study and the program of activities of the defendant are irregular, uncertain, and without form, while the public school curriculum is definite and allots a specified time and, in most cases, a special teacher for every subject studied in the fifth and sixth grades; (3) that the instruction given by the defendants is without proper or modern textbooks, lacks supervision by competent authorities of pupil and teacher, lacks a method, standard, or other means of determining the progress or attainments of the child; none of which deficiencies are present in the public school; (4) that the teaching of discipline and health habits lacks plan and a trained method, fixing responsibility on the child for its execution; while, at the school, it is part of a definite program of char-

acter education; (5) that the defendants cannot provide for group or class teaching, and lack the ability to develop attitudes and create a social setting so that the children may be trained to deal with their playmates and friends as a part of a social group; (6) that the public school system provides such social groups and lays emphasis on its development, and stresses the adjustment of the child to group life and group activity and a course of living that he will be required to follow and meet as he goes out into the world.

The primary function of education is to get an understanding and interpretation of modern civilization. In the early days of the republic, the idea that an educated citizenship lies at the very foundation of a democratic government has defined our philosophy of national development. For these reasons, the maintenance of an adequate system of public education for youth is a fundamental responsibility of any commonwealth. The public school system of New Jersey embodies the highest ideals of American democracy, and has developed a program which offers unusual opportunities to the children of our state. All citizens have a deep interest in our public schools, and should take pride in the high rank which they occupy in the nation. To deny children instruction seems as unnatural as to withhold their necessary subsistence. Education is brought, as it were, to the very door of all classes of society, and ignorance is quite inexcusable. The failure of the parents to provide the child with the benefits of that opportunity should be a matter of great concern when at issue. The education of youth is of such vast importance and of such singular utility in the journey of life that it obviously carries its own recommendation with it, for on it, in a great measure, depends all that we ever hope to be; every perfection that a generous and well disposed mind would gladly arrive at. It is this that usually renders one man preferable to another. And, as the great end of learning is to teach man to know himself and to fit him for life, so he who knows most is enabled to practice best and to be an example for those who know but little.

The schools, whose function frequently is thought of solely in material terms, have a far more important responsibility.

They must aid parents, not simply in the training of their children for the trades and professions, whose criterion of success too often is the amount of money they can make, but, rather, the training and development of men and women of character; men and women whose minds have been trained to the understanding of basic principles and ideals, with the courage and strength of will to live up to and apply them in their daily lives.

I incline to the opinion that education is no longer concerned merely with the acquisition of facts; the instilling of worthy habits, attitudes, appreciations and skills is far more important than mere imparting of subject-matter. A primary objective of education to-day is the development of character and good citizenship. Education must impart to the child the way to live. This brings me to the belief that, in a cosmopolitan area such as we live in, with all the complexities of life, and our reliance upon others to carry out the functions of education, it is almost impossible for a child to be adequately taught in his home. 1 cannot conceive how a child can receive in the home instruction and experiences in group activity and in social outlook in any manner or form comparable to that provided in the public school. To give him less than that is depriving the child of the training and development of the most necessary emotions and instincts of life. I cannot accept the theory asserted by Mr. Bongart that, "I am not interested in method, but in results." That theory is archaic, mechanical and destructive of the finer instincts of the child. It does seem to me, too, quite unlikely that this type of instruction could produce a child with all the attributes that a person of education, refinement and character should possess.

I have carefully observed the defendants' children in court, their demeanor, their responses under examination, and their reaction to the proceedings while in court, and there is clear evidence that it is their belief that they are on a "grand holiday," free from the restraints, discipline and responsibility of other children in school attendance. All of this seems to me to be attributable to the course adopted and pursued by the parents. I have also carefully examined all the evidence and exhibits, and it is my opinion that the defendants have failed

to give their children instruction equivalent to that provided in the public schools in the fifth and sixth grades, but, rather, have engaged in a haphazard and hit-or-miss kind of instruction, not calculated to conform with the provisions of the statute, and that both defendants actively and independently participated in causing their children not to go to the public school or a day school. I have been satisfied beyond a reasonable doubt by the evidence of the guilt of both defendants as charged. Both defendants are hereby deemed to be disorderly persons.