## CIRCUIT COURT OF THE CITY OF NORFOLK

Norfolk Department
of Social Services

v.

Virginia Petermore

October 24, 2003

Case No. (Chancery) C03-86

BY JUDGE CHARLES E. POSTON

Today the Court finds that O.G., a female born March 14, 2003, is a child in need of services (CHINS), approves the foster care plan submitted by the Norfolk Division of Social Services and grants O.G.'s custody to her father, Robert C. Griffin, with supervision by the Division of Social Services.

### Procedural History

The Norfolk Division of Social Services (NDSS) commenced this cause on April 8, 2003, by filing a petition in the Norfolk Juvenile and Domestic Relations District Court alleging that O.G. "is a child in need of services whose condition presents or results in a serious threat to the well being and physical safety of the child ... and that continued placement in the home would be contrary to the welfare of the child. . . ." The Juvenile Court appointed Cynthia D. Garris, Esquire, guardian *ad litem* for O.G., and on May 2, 2003, the Juvenile Court dismissed the petition. NDSS noted and perfected its appeal, and the matter was docketed in this Court to be heard *de novo*.

On July 23, 2003, this Court found that O.G. was a child in need of services, awarded her temporary custody to NDSS, and continued the matter for a final hearing. As required by Virginia Code § 16.1-281, NDSS filed a foster care plan on August 25, 2003, and docketed the 75-day dispositional

hearing for September 12, 2003. Two days before the foster care plan was filed, Robert Griffin, O.G.'s father, had filed his own petition for her custody. All of these matters were then set for an *ore tenus* hearing on September 24, 2003.

*Facts*

The facts are largely undisputed and are explained more completely in the three exhibits introduced without objection at the hearing of September 24, 2003. A report from NDSS titled "Norfolk Department of Human Services Case History: Virginia Petermore" was admitted as Exhibit C-1, and all parties stipulated to its accuracy.

> Virginia Petermore, O.G.'s mother, has a history of abusing children. On April 17, 2002, Petermore pleaded guilty to assaulting her ten-year old son Kevin in December 2001 in violation of Virginia Code § 18.2-57.2, a misdemeanor. Petermore had lashed Kevin on his face and buttocks with a dog leash, and deep bruises were found completely covering his lumbar region, buttocks, the middle of his back, his side, right shoulder, and upper arm. His sister told the Child Protective Service worker that Petermore beat Kevin for perhaps fifteen minutes with her fists and the dog leash.[1] The Court accepted her plea, found her guilty, and ordered a pre-sentence report for August 2, 2002.

Reports submitted to the Court documented that Petermore suffers from ADHD and depression and displays an evasive, sometimes histrionic, and self-absorbed personality. According to these reports, Petermore is highly resistant to admitting any personal faults or misbehavior, and she has not developed productive outlets for the great amount of anger and resentment she possesses. While Petermore presented her parenting skills in an unrealistically favorable light, others observed them to be deplorable. As a result, her children struggled to socialize properly with peers and were doing poorly in school.

On August 2, 2002, this Court sentenced Petermore to twelve months in the City jail, suspended execution of the sentence for ten years, and placed her on supervised probation for the entire ten-year period. At the sentencing hearing, the Court said:

---

[1] Kevin's abuse was extreme, which is even more alarming in light of the fact that Petermore had been the subject of a founded complaint of abusing Kevin in 1998.

A further condition [of probation] is that you not seek, not receive, and not accept custody of these children during this period. Further, conditioned upon you [sic] having no visitation during the period of the suspended sentence.

The probation officer is directed to advise the Court if you become pregnant with any other children or enter any living arrangements where there are any minor children. It is the intent of this Court that during the ten-year period that you are to have no contact with any minor children. The Court directed that its sentencing comments be transcribed and delivered to NDSS, the probation officer, and the Juvenile Court.

Following the last instance of abuse of Kevin, he and his sister were placed in the custody of their father and now live with him in Illinois. During the pendency of these matters, NDSS rendered a finding of Level One physical abuse of Kevin and assessed Petermore's risk of committing further acts of abuse as "high." This assessment was based on several factors: Petermore has never admitted to abusing Kevin and has shown no remorse. She inflicted a severe bruising on him, as well as injury to his face, used an instrument to inflict the injury, and indeed to this day Petermore has taken absolutely no responsibility for her actions.

Petermore was pregnant with O.G. when she was sentenced, but did not advise the Court. Her probation officer learned that she was pregnant on February 2, 2003, and confronted her with that information on February 10, 2003. Petermore admitted knowing of the pregnancy when she was sentenced. O.G. was born on March 4, 2003,[2] and Petermore was found in violation of her probation.

Petermore submitted to a Parenting Capacity Evaluation at the Children's Hospital of The King's Daughters in early 2002. This exhaustive evaluation resulted in a number of recommendations, one of which was to keep Petermore separate from her children until extensive therapy and education were accomplished. Later NDSS and probation officer observations, as well as the Court's own determination from the evidence presented, indicate that these recommendations remain valid. A psychological evaluation of Petermore arranged by NDSS at the Court's direction in the case at bar does little more than recite a history of this matter and is of no value to the Court.

Petermore argues that, because O.G. has not suffered any abuse, there is no basis for a change of custody because O.G. is not a child in need of

---

[2] Despite having full knowledge of Petermore's history of abuse and this Court's sentencing order, NDSS did nothing to protect O.G. until April 8, 2003.

services. The Juvenile Court evidently concurred because it dismissed NDSS's petition after finding that the "mere birth of subsequent child is not actionable under the law."

## Discussion

### A. *Historical Perspective*

The welfare and protection of children has occupied a position of special concern in the law for centuries. Blackstone wrote that the Lord Chancellor, who exercised the Crown's authority, was "by right derived from the crown, the general and supreme guardian of all infants. . . ." 1 William Blackstone, *Commentaries* 463. In its definition of the term "Lord High Chancellor," Ballentine's describes this governmental interest in a bit more detail: "He had the appointment of all justices of the peace, was keeper of the king's conscience, visitor in the king's right of all hospitals and colleges, the general guardian of all infants, idiots, and lunatics, and supreme judge of the court of chancery." *Ballentine's Law Dictionary* (3d ed. 1969).

This concern is rooted in the concept of *parens patriae*, which in turn is derived from the royal prerogative. The royal prerogative encompassed certain duties and powers the king retained from the feudal system, which powers were exercised by him in his role as "father of the country." One of those duties is to serve as the general guardian of infants. *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 257 (1972). When America separated from England, the Commonwealth of Virginia became sovereign and vested with the *parens patriae* powers and duties, one of which was to serve as general guardian of all incompetents within her borders. *O'Connor v. Donaldson*, 422 U.S. 563, 583 (1975).

The responsibility of exercising the state's duty to serve as the general guardian of children and other incompetents has been vested primarily in courts having chancery jurisdiction. *See Fox v. Minor*, 32 Cal. 111, 116 (1867); *Lippincott v. Lippincott*, 128 A. 254 (N.J. 1925).

Under the common law, both in England and in this country, courts of equity jurisdiction have a general supervisory authority over the persons and property of all citizens who are *non sui juris*. To this end they may, upon proper application and showing, appoint representatives for such incompetents, with authority to take charge not only of their persons, but also of their property, dependent upon the facts. Such authority exercised by the chancery courts is bottomed upon the

theory that the sovereignty is the general guardian of all incompetents and that it exercises its functions as such through its chancery courts.

*Keegan's Guardian v. United States Trust Co.*, 182 Ky. 330, 332 (1918) (internal citations omitted). The States did not surrender this responsibility to the Federal government with the adoption of the Constitution, and it still remains true that "the States are vested with the historic *parens patriae* power, including the duty to protect 'persons under legal disabilities to act for themselves.' The classic example of this role is when a State undertakes to act as 'the legal guardian of all infants, idiots, and lunatics'." *O'Connor*, 422 U.S. at 583.

## B. *Contemporary Virginia Law*

In Virginia, the general chancery jurisdiction lies within the circuit courts. Va. Code § 17.1-513. However, the responsibility for the care and protection of the persons of minors lies in the Juvenile and Domestic Relations District Courts pursuant to the Juvenile Court Law. Va. Code § 16.1-226 *et seq.* Indeed, that law specifically grants those courts "all necessary and incidental powers and authority, whether legal or *equitable* in their nature." Va. Code § 16.1-227 (emphasis supplied). Of course, the jurisdiction of *this* Court to hear and decide matters by appeal from the judgment of the Juvenile Court is completely derivative of the jurisdiction of that lower court. *Fredericksburg Dept. of Soc. Servs. v. Brown*, 33 Va. App. 313 (2000).

Among the many matters committed to the Juvenile Court's jurisdiction is the power to hear and decide cases involving the custody and disposition of a child "[w]ho is alleged to be abused, neglected, in need of services, in need of supervision, a status offender, or delinquent. . . ." Va. Code § 16.1-241(A)(1). A "child in need of services" is defined as a child whose "behavior, conduct, or condition presents or results in a serious threat to the well-being and physical safety of the child. . . ." Va. Code § 16.1-228. In order to declare that a child is in need of services, the provision requires first that the judge determine that:

> (i) [T]he conduct complained of must present a clear and substantial danger to the child's life or health or to the life or health of another person, (ii) the child or his family is in need of treatment, rehabilitation, or services not presently being received, and (iii) the intervention of the court is essential to provide the treatment, rehabilitation, or services needed by the child or his family.

*Id.*

No particular standards or tests have developed in case law to determine whether a child is one in need of services. Instead, the statute clearly allows the deciding judge to determine what is in the best interests of the child(ren) involved depending upon the facts presented. This is outlined by the Virginia General Assembly which, when it enacted § 16.1-227, gave the courts guidance in its interpretation:

> This law shall be construed *liberally and as remedial in character*, and the powers hereby conferred are intended to be general to effect the beneficial purposes herein set forth. It is the intention of this law that, in all proceedings, the welfare of the child and the family, the safety of the community, and the protection of the rights of victims are the paramount concerns of the Commonwealth and, to the end that these purposes may be attained, the judge shall possess all necessary and incidental powers and authority, whether legal or equitable in their nature.

(Emphasis added.) *See also Croteau v. Croteau*, 246 B.R. 254 (Bankr. E.D. Va. 2000) (When a child's custody is at issue, the Juvenile Court's jurisdiction is "remarkably broad.").

The General Assembly understood that each child custody case is unique and it is appropriate for a judge to reach a solution that, above all, protects the innocent children who find themselves in these lamentable situations. Cases involving the abuse of children often involve matters of life and death, and it is incumbent upon any arbiter to determine painstakingly that he or she is reaching the correct result.

The proposition that "mere birth of a subsequent child is not actionable under the law" is an incorrect reading of Virginia law. Virginia Code § 16.1-228 pertains to *all* children, regardless of age. Additionally, the definition of a child in need of services, by its plain meaning, does not look only to the past or present, but also to the future. When a child comes to reside with a convicted child abuser, the Commonwealth is not required to wait until the child is abused before acting. The condition of the child in such cases, living with a child abuser, is sufficient to invoke the Court's jurisdiction. Were this not true, the Commonwealth would have forsaken its responsibility as the ultimate guardian of all children within her borders. This conclusion is supported by the common law, statutory law, and common sense.

The Virginia Court of Appeals was faced with a situation analogous to the case at bar in *Jenkins v. Winchester Dept. of Soc. Serv.*, 12 Va. App. 1178, 409 S.E.2d 16 (1991). In that case, based upon its prior experience with the

defendant, the Winchester Department of Social Services petitioned for custody of her infant the day after the child's birth. Defendant's four older children had been severely neglected and abused due to defendant's mental and psychological conditions, which remained unimproved. The preemptive petition was endorsed by the appellate court:

> We agree with the Department that the statutory definitions of an abused or neglected child do not require proof of actual harm or impairment having been experienced by the child. The term "substantial risk" speaks *in futuro* and ... [n]o evidence in the record suggests a realistic probability of improvement or alleviation of the conditions which led to the removal initially.
>
> Accordingly, we hold that the Code contemplates intervention in such circumstances by allowing for the ... removal of children before placement into an environment where "the child would be subjected to an imminent threat to life or health to the extent that severe or irreversible injury would be likely to result if the child were returned to or left in the custody of his parent."

*Id.* at 1183 (*citing* Va. Code § 16.1-251(A)(1)).

## Conclusion

O.G. inherited the same predicament as her siblings, who have already been removed from her mother's care. And because this Court does not consider Petermore to be rehabilitated, it is highly likely that she would suffer the same fate without state action. Clearly, where a child is born into an unstable and dangerous situation, it is not in the child's best interest to wait for the child to experience his or her own personal hell so as to justify removal from the home. Children are most vulnerable as infants and, at that stage, are most in need of the protection of the Commonwealth.

It is abundantly clear to the Court that, at this time, Ms. Petermore is not fit to have the custody of O.G. The Court therefore finds that O.G. is a child in need of services, approves the foster care plan submitted by the Norfolk Division of Social Services (DSS), and grants O.G.'s care and custody to her father, Robert C. Griffin, with supervision by the Norfolk Division of Social Services. Visitation with O.G.'s mother, Virginia Petermore, shall be within the discretion of DSS; but, if visitation is permitted, DSS shall insure that a responsible adult is always present while O.G. is with her mother. Overnight visitation by the mother is prohibited until further decree of the Court.

322

Pursuant to Virginia Code § 16.1-297, this cause is remanded to the Norfolk Juvenile and Domestic Relations District Court. It is so adjudged, ordered, and decreed.