STATE, EX REL. CLARA MEADE LANDIS, v. CHARLES K. LANDIS.

1. The act of March 26th, 1860, " An act concerning the custody of infants," is not repealed by the act of 1871, "A supplement to an act concerning divorces."

2. The condition of separation contemplated by the act, exists in this case.

3. By force of the act of 1860, " the mother is entitled to the custody of her children under the age of seven years, unless it affirmatively appears that, in her custody, they would be exposed to either neglect, cruelty, or the acquisition of immoral habits and principles."

On *habeas corpus.*

The writ was allowed on the petition of Clara M. Landis, setting out that she had separated from her husband, on account of cruel treatment, and was living in a state of separation; that there were two children, each under the age of seven years, in the custody of Charles K. Landis. The writ was prayed for, &c. It was allowed, and made returnable August 9th, 1875.

The respondent was present with the children, on the return day, and time was given for his counsel to prepare a return. The children, in the meantime, remained, by order of the court, in possession of the respondent, who entered into recognizance to produce them at any time.

The return was filed on the 9th day of August, 1875, setting up such alleged facts as was supposed to show that the petitioner was of such habits and character as to render her an improper guardian. Also, that there was no such condition of separation as the statute contemplated. Also, that the act of 1860 was repealed by a subsequent act of 1871, entitled " A supplement to an act concerning divorces."

Upon the last point, an argument was then heard, W. E. Potter, for respondent, and Cortlandt Parker, for petitioner. The justice held there was no repeal of the act

of 1860. The counsel for the petitioner filed a traverse to the return.

Testimony was taken, and the cause came on for final hearing on the 16th of February, 1877.

For the petitioner, *S. H. Grey* and *Cortlandt Parker*.

For the respondent, *James H. Nixon, Benjamin William-son* and *Benjamin H. Brewster*, of Philadelphia.

REED, J. Clara M. Landis left the house of her husband on the 22d day of May, A. D. 1875, and since then has been living separate from him. There were born to them three children, now living. Two of them, boys, were in the possession of the father at the time of the allowance of this writ.

They were, and still are, within the age of seven years. By this writ, the children are in court, and the question is now as to their disposition. The mother claims their custody. Her claim is based upon the act passed March 26th, 1860, entitled "An act concerning the custody of infants." *Nix. Dig.* 391. Outside of this statute, in this proceeding, the mother has no legal claim. *State* v. *Stigall et al.*, 2 *Zab.* 286. The first insistment of the respondent is, that the act of 1860 is not in existence.

This was urged early in the case, and it was put upon the ground that the act of 1860 had been repealed. It is admitted that there is no enactment of a repealing statute. The insistment is, that it is repealed by implication, by the passage of the act of 1871, (*Laws*, 1871, *pp.* 15, 16; *Rev.*, *p.* 318,) entitled "A supplement to an act concerning divorces "—

*First.* That this repeal is effected because the latter act covers the same subject matter.

*Second.* Because the latter act is repugnant, in its provisions, to the first statute.

I did not, at the time of the original able argument, think it convincing, and I have not, upon subsequent reflection, perceived any reason to change my conclusion.

Both acts, it is true, deal with the custody of infants. The direction in each is different. But each statute is confined to the regulation of the manner of exercising judicial authority in a particular proceeding—the first upon the proceeding of *habeas corpus*, the latter upon petition to the Chancellor, or where suit for divorce was pending, or had already been determined.

It of course seems, upon first view, absurd that a Chancellor should be controlled by one rule in one proceeding, and by another rule in another proceeding, where the parties are the same, and the subject of the proceedings identical. But a diversity existed before the passage of either of these acts.

In the exhaustive elucidation of the power of the Chancellor upon each of these two proceedings, in Baird *v.* Baird, it is apparent that there was a wide distinction between the power of the Chancellor when exercising his general equity jurisdiction over infants, and his authority when hearing the same matters upon return to a writ of *habeas corpus*. In the latter instance, he had the power of a common law judge, and no greater authority. In the former, he had the right to consider the welfare of the child, as the controlling motive in the adjustment of the custody of the infant. And this was so, whether the children were already in the custody of the mother or the father.

The act of 1860 did not operate to remove such diversity by giving the judge or Chancellor, on *habeas corpus*, the same power to award custody as the Chancellor had in equity proceedings.

On the first proceeding, a different rule was adopted from that which prevailed at common law.

By the act of 1860, the several rights of the parents were inverted. The rule under the act was more in conformity with the manner in which a court of equity would exercise

Landis v. Landis.

its discretion, yet, in the one case, the rule was discretionary, and in the other, peremptory. The difference, although not great, still existed.

Then the act of 1871 was enacted, which is claimed as a repealer of the act of 1860. The argument is, not that the court or judge must now award custody according to the direction of the latter act, but that the court or judge has no authority at all to adjudge as to custody; that the infant can be discharged from restraint as at common law, but that the additional authority to award custody given by the act is gone; that the act of 1871, by legislative intent, gives to chancery the exclusive authority over the subject of custody, and so impliedly strips the Supreme Court and its judges of the statutory authority under the previous act. The legal rule to be observed, in considering this, is stated in *Sedg. on Stat. Con.* 106: "Laws are presumed to be passed with deliberation, and with full knowledge of all existing ones on the same subject. And it is, therefore, but reasonable to conclude that the legislature, in passing a statute, did not intend to interfere with or abrogate any prior law relating to the same matter, unless the repugnancy between the two is irreconcilable; and hence a repeal by implication is not favored. On the contrary, the courts are bound to uphold the prior law, if the two acts may well subsist together."

It seems to me that it would be perverting the whole doctrine of repeal by implication, to apply it in this case.

The two acts incidentally touch the matter of custody, but one is to direct the Chancellor in a proceeding purely equitable, and the other to give jurisdiction to and control its exercise by a judge in a technical and legal proceeding.

If the design was to vest exclusive jurisdiction in chancery over this subject, this was a strange way of accomplishing that purpose. There was no authority elsewhere, except by force of this act of 1860. One of the alleged objects of this act of 1871, was to deprive the judges of that authority, yet the title of that act of 1871 was a supplement to the act concerning divorces. No allusion is made to the act of 1860.

There is nothing in it to indicate that *all* jurisdiction over the custody of infants should be lodged in the Chancellor, upon petition, or otherwise.

I see nothing in the act of 1871 to take away the jurisdiction of the Supreme Court, or a judge thereof, to make an order under the act of 1860.

The same consideration deprives the re-enactment of the last statute in the revision from any effect upon the act of 1860.

It is next urged that there was no condition of separation between Mr. and Mrs. Landis, as the statute contemplates. This matter is set at rest by the cases already decided since the passage of the act of 1860. *Bennett* v. *Bennett*, 2 *Beas.* 114; *Baird* v. *Baird*, 4 *C. E. Green.* 481; *S. C.*, 6 *Id.* 384.

It is also said that Mrs. Landis lives out of the state, and, therefore, she cannot have an order in her favor. Was it true, in fact, that she lives without the state, it would present the same condition of affairs as in the case of Baird *v.* Baird. The father sued out the writ in that case, and he resided in Philadelphia. Three children were delivered to him. The remainder were left with the mother.

We now face the questions of fact in the cause. It is admitted the children are under seven years of age. By force of the act of 1860, the mother is entitled to their custody, unless she is of such character and habits as to render her an improper guardian. Before the act, the father had, as since the mother has, the right of custody. As to children under seven years of age, the mother now, in all cases upon *habeas corpus*, is in the same position as the father was before the act, when the children were already in the possession of the mother. He then had the right to their custody, unless such custody would expose the children to gross cruelty, corruption, immoral habits and principles. *State* v. *Stigall*, 2 *Zab.* 286. The mother now has the same right, unless, by her character and habits, the children, in her custody, would be exposed in the same manner. The contingency must be clearly shown. Is it proved in this case?

Landis v. Landis.

We must first keep in mind that the mere fact of separation raises no presumption against the mother. *Bennett* v. *Bennett*, 2 *Beas.* 117.

There might be facts attending the separation which would show an immoral disposition, as, for instance, in being influenced to that action by an improper regard for a man other than her husband. Such does not appear at all in this case. The grounds upon which the allegation of improper character and habits are placed, are these: improper conduct as a wife, dislike of her children, neglect of her children.

I see nothing in the first point to demand serious consideration. I do not believe the testimony of the boy Cobb. As to the visits by, and croquet playing with Davis, and her acquaintance with the two Sands (her brothers-in-law), her alleged notes to Burke, &c., I see nothing beyond a possibly debatable question of propriety. There is nothing in the testimony from which I can impute unchastity, corrupt character, or immoral habits to the mother.

That these children, within the age of seven years, in the custody of the mother, surrounded by the influence of her family, would be subject to immoral principles and habits, is a proposition, the absurdity of which is apparent from its statement.

Next, her dislike to the children is alleged. It is sworn that the mother, on one or two occasions, made inquiries as to what would prevent child-bearing. As to this, I entirely concur with the Chancellor, in *Baird* v. *Baird*, 3 *C. E. Green* 200.

I think a woman who had borne as many children as this mother, might desire to evade the danger and pain of additional child-bearing, and yet be an affectionate mother to those already born to her. Nor do pettish remarks, such as testified to by Sarah Stewart or Mrs. Ring, prove an unmaternal disposition. If every word spoken by a mother in moments of vexation and irritation, should be collated and held to prove an aversion to her children, I fear that few

would have the infinite patience and equable disposition to show a clear record.

Closely connected with this point, and more relied upon to prove the mother's unfitness, is the allegation of neglect of her children. The particular instances of ill-treatment or neglect are meagre. There is only one instance, when she punished a child with a slipper.

Mr. Ring speaks of her putting a child out of the room when she had company. Burke mentioned her stopping the carriage and setting a child out of her carriage, opposite her house, at the door of which the child was met by a nurse. Mr. Neff speaks of rescuing one of the children from a wagon at the ferry, while Mrs. Landis' attention was directed to some baggage. These incidents are not of sufficient importance to demand serious consideration.

It is further alleged that she exhibited a want of proper solicitude for her child, when sick at Washington city, at Chelton Hills, and at Vineland.

The first is sworn to by Ellen Norton. She swears, also, to the general neglect of the children. I think her testimony should be received with circumspection. She evidently has a pique towards Mrs. Landis. She admits that they parted unfriendly. I think she was discharged for drunkenness. Her specific charge is, that she sent three times for Mrs. Landis, when Dicky was sick, and the doctor arrived before the mother. She says, however, that Dicky was the favorite of his mother, because he looked like her; that the trip to Washington was to have some kind of an operation performed for Dicky, and Mrs. Landis and she went to the place of the operation with the child.

The incident of the sickness of Charley, at Chelton Hills, is testified to by Mr. Earle. The doctor was called, and sent by Mrs. Landis to the sick-room, and came back and reported to Mrs. Landis. How sick the child was, and whether the nurse was in the room, he does not know.

The occasion of the sickness of the child at Vineland, was when Mrs. Landis was telegraphed for at Jenkintown, and

came, and it is alleged that she came down, and at once went out riding, without seeing the child. I think this is a mistake, and that she did see the child, and was assured that it was convalescing; then she went to call on her friend.

These are the specific instances of inattention that I recall. The remainder of the testimony was to the effect that she did not give proper attention to her children.

What is proper attention, is a matter of difficulty, depending upon each case. Children supervised by grandmothers or aunts, do not require the personal attention of a mother that infants less fortunate demand; a robust and good-tempered child less than a sickly or irritable infant; children with none, or with incompetent nurses, more vigilant attention than those who are provided with efficient nurses.

Then, again, each person has his or her own standard of devotion which a mother, under the same condition of affairs, should manifest.

So this, like all other matters of opinion, takes its color from the personal views of each witness, and the court can judge with little certainty, except from specific acts.

Ellen Norton says she gave little or no attention to them. I doubt whether the opinion of a nurse who naturally desires to be relieved of a part of her care, and whose dislike to the mother is so manifest, should receive very great consideration in determining the conduct of the mother.

Mr. Earle says she neglected them at Chelton Hills; but that she gave attention to them, I think is evidenced by her threatened discharge of one of the nurses for drunkenness.

Mr. Snowden says the same, but he seems to have had very little personal knowledge. Mr. Heacock says the same.

Sarah Stewart says she was sometimes kind and sometimes not. John Ring, who was left in charge of the house by Mr. Landis, testifies to the same effect.

On the other hand, there is the testimony of Anna H., Daniel, and Mary C. Morrill, who were intimate with the Landises, and who testify to her kindness to and care for her

children.   So, also, Mary E. and Marion L. Tompkins.   So, also, Anna S. Parkinson.

There is, in addition, the testimony of Dr. Lansing, who attended the family from 1867 to 1872, and who was socially intimate with the family.   He says hers was the ordinary care of a careful, pains-taking mother towards her children.

Dr. Lane, who has attended the family since 1872, says he saw her when she returned from Jenkintown; she was in the room with the sick child; that in his presence she was always kind to them.   Dr. Brewer speaks in the same manner.

Without reference to the testimony of the parties themselves, and their immediate relatives, I do not think, upon any or all the points upon which testimony has been taken, it has been proved that the mother is of such character and habits as to render her an improper guardian for such children.

By force of the statute, an order should be made that the children be discharged from any restraint by the father, and that they shall be delivered, and remain in the custody of Clara M. Landis, the mother, until they severally attain the age of seven years.