CARL S. ZIEZEL, petitioner,

*v.*

BENJAMIN H. B. HUTCHINSON et al., defendants.

[Argued November term, 1919.  Decided March term, 1920.]

A (girl) child from her birth was retained, with the consent of her father, by the maternal grandparents, the mother having died at the birth. The child was raised by the grandparents until she reached the age of three years, when the father, whose circumstances had changed in the interim, claimed her upon *habeas corpus.—Held*, that in the absence of satisfactory proof of parental unfitness, the father, as the legal custodian of the child, was entitled to her possession.

On appeal from an order on *habeas corpus.*

*Mr. D. Trueman Stackhouse,* for the petitioner.

*Mr. William J. Kraft,* for the defendants.

The opinion of the court was delivered by

MINTURN, J.

On the 15th of May, 1916, two days before her mother's death, Virginia A. Hutchinson, the infant daughter of the petitioner, and the subject of this controversy, was born at Camden, in this state, in the humble but comfortable home of her maternal grandparents, the defendants in this proceeding.

The grandmother tells the simple story of the acquisition of the child at her birth: "The night she died I put my arm around Carl's (the petitioner's) neck, and I said, 'Carl you have robbed me of Florence (the mother of the child), and now you will never take the baby from me, will you?' and he said 'No.'"

Three years have elapsed, and in the interim the world war drew the petitioner from the old environment of his wife and child, and gave him the opportunity to become a lieutenant in the navy, as a dental surgeon; to cross the ocean frequently, and visit other lands, and incidentally to marry a lady, described by the lower court as "a woman of amiable disposition and moral worth." When his child was born he was unable to support and care for her, and quite manifestly the parental appeal of the grandmother was opportune, and fell not on unwilling ears.

To him manifestly, a young man without means, slightly over his majority, with laudable ambitions, and an education as he testified, "in excess of the average," a new vista opened up; and in that mental vision the "youngster," as he laconically terms the child, would assuredly become a burden and perhaps a handicap. There not having been a legal adoption of the child by the grandparents, the consent given by the father on the night of the birth was morally, but not legally binding upon him. *2 Rul. C. L. and cases; 29 Cyc. 1591 and cases.*

With the advent of a new wife came the "vita nuova" of which Dante speaks; and also a salary in the navy in excess of $3,000 per year, and six furnished rooms in an apartment house upon a prominent avenue in Brooklyn. In the elder days the grandmother in the letters of the petitioner was "Dear Ma." In the metamorphosis that came with the new life, she was transmuted into "My dear Mrs. Hutchinson." The grandparents in Camden still maintained the old life, in the old way; and as the years passed by, the child knowing no other parents, now at the interesting age of three years, clings to them, and they to her, with all the filial affection and intense devotion that time and tender family association alone can bring. Whether the father during that period furnished the grandparents with any substantial means of support for the child, remains a controverted question upon the record; but concededly at most it was intermittent and desultory, and they alone practically nurtured her to her present development. In this situation the father upon this writ of *habeas corpus* claims her, as was his legal right. Like the famed denizen of Venice

he had only to proclaim, "My deeds upon my head, I crave the law," and the law in the absence of proof of unfitness, would respond to his wishes; for as Blackstone declares, "The empire of the father continues even after his death" (*1 Bl. 453*); or as Chancellor Kent states the same proposition, he is

"in contemplation of the law entitled to the custody of the persons, and to the value of the services and labor of the children during their minority." *2 Kent Com. 193.*

But in his testimony the petitioner deemed it necessary to accentuate his obvious legal right by invoking equitable considerations involving the alleged mental obliquity of the grandparents, and the debasing environment of the old *habitat,* upon the child of a man of superior tastes and refinement. Thus he testifies,

"She is allowed to go dirty. Her body and health are not looked out for. Her clothing is such as disgraces me when I have taken her out. Evidently, the money applied to her keeping is not applied to her at all. The grandparents have absolutely no insight into the rearing—the scientific rearing of children; nor have they into their mental development. They do not grasp the fundamental principles required in raising a child. They will say the grandmother's sight is failing; she offers this as excuses when I complain of the child's dirty attire. The home is filthy dirty. And were she put in my care she would be in a home of cleanliness and looked out for by a father who has a professional education—an education, perhaps, in excess of the average, and a mother who has an excess of education over any of the grandparents."

Manifestly *"Tempora mutantur et nos mutamur in illos."*

That the old home in Camden is as it was when the petitioner claimed it as the abode of his wife and himself, and as a fit natal place for his child; and that these defendants have not changed with the advent of life's gloaming, but remain the same unalloyed type of simple homely people, who took him to their hearthstone in the years of his early struggles, becomes manifest by a reference to the testimony of the grandmother:

"I give her a bath every night of her life. I never put her to bed without a bath. If I don't give her a bath, I give her a sponge bath, and she has a clean bed to sleep in. Her clothing has always been plain;

of course, a child will get dirty, a little dusty, and her hands out playing around; but I have always kept her clean. You know any child will get dirty playing. We intend to bring her up right, and she is christened in the Methodist Church, and she will go to Sunday School."

So much only of this record is it necessary to recite, in order to state that while we agree with the conclusion of the learned advisory master, that the child must be awarded to the father, as her legal custodian, upon the familiar rule of law to which we have adverted, and which has received practical application in the courts of this state in the following adjudications—*Baird* v. *Baird, 18 N. J. Eq. 194; Landis* v. *Landis, 39 N. J. Law 274; Luppie* v. *Winans, 37 N. J. Eq. 245*—we, nevertheless, do not deem it necessary to make the award upon any proven theory of the fitness or unfitness of either party to the controversy, compared with the other. Were the child of sufficent age to realize the situation, the rule is well settled that the court in its concern for the welfare of the infant, as the prime consideration, would be influenced in some degree by the infant's predilection. *State* v. *Stigall, 22 N. J. Law 286; Baird* v. *Baird, supra; Richards* v. *Collins, 45 N. J. Eq. 283; Wood* v. *Wood, 77 N. J. Eq. 593.*

But the case failing to present that situation, and in the absence of satisfactory proof of parental unfitness, the child in compliance with the inexorable legal mandate, must be awarded to her father. *Bennet* v. *Bennet, 13 N. J. Eq. 114; Magee* v. *Holland, 27 N. J. Law 86; Morris* v. *Wardell, 67 Atl. Rep. 850.*

The order of the court of chancery must therefore be affirmed.

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, BLACK, WHITE, HEPPENHEIMER, WILLIAMS, TAYLOR, ACKERSON—12.

*For reversal*—None.