18 N.J. Super. 559 (1952)
87 A.2d 739
JOE B. LAVIGNE AND LOUISE P. LAVIGNE, HIS WIFE, PLAINTIFFS-RESPONDENTS,
v.
THE FAMILY AND CHILDREN'S SOCIETY OF ELIZABETH, A NEW JERSEY CORPORATION, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 10, 1952.
Decided March 24, 1952.
*562 Before Judges JACOBS, EASTWOOD and BIGELOW.
Mr. Donald G. Davis argued the cause for the plaintiffs-respondents.
Mr. Joseph A. Porter argued the cause for the defendant-appellant (Messrs. Whittemore, Porter & Pollis, attorneys).
Mr. Edward Terner, counsel for Childrens Aid and Adoption Society.
Messrs. Farkas & Samuels, attorneys for Jewish Child Care Association of Essex County.
Messrs. Ormond & Dippel, attorneys for Childrens Aid and Society for Prevention of Cruelty to Children.
Messrs. Bennett and Shepard, attorneys for Family and Childrens Society of Montclair.
The opinion of the court was delivered by EASTWOOD, J.A.D.
The fundamental question is whether a written "surrender" of their child, executed by the parents, *563 Joe B. Lavigne and Louise P. Lavigne, plaintiffs, to the defendant-appellant, The Family and Children's Society of Elizabeth (hereinafter referred to as the "Society"), is irrevocable. The Chancery Division held that, under the circumstances, it was revocable and ordered the defendant society to return the infant child to her parents. The defendant appeals from the ensuing judgment.
The pertinent facts are: The plaintiffs were married on November 26, 1947. Diane was born to them on March 5, 1949, at Berkeley, California, where the father was an undergraduate student at the University of California. Upon his graduation, the family moved to New Jersey where the father became employed as a chemist with Merck & Company. On September 23, 1949, the plaintiffs brought their daughter, then six months old, to the Society's office to discuss the plaintiffs' problems with respect to her care. Interviews with the parents were held with a representative of the Society about once a week thereafter until October 21, 1949, when the parents agreed that the Society might place the baby in a foster home, where, after placement, Diane remained until May 26, 1950. During that time representatives of the Society interviewed the plaintiffs about twice a month. Because of the inability of the owner of the foster home to care for the child, she was returned to her parents on May 26, 1950. She remained with them until July 31, 1950, when she was returned to the defendant Society. At that time, the plaintiffs executed a written waiver of all custody and control of the child and consented that the Society, an approved agency, place the child for adoption. In August, Diane was placed by the Society in a private home for adoption. In mid-April, 1951, the father called at the Society's office and demanded the return of his child. Upon its refusal, the plaintiffs instituted this action in June, 1951, to compel the return of the child to them. The trial court held that under the circumstances, the surrender agreement was not irrevocable and that the best interests of the child would be promoted by awarding custody to the plaintiffs.
*564 The Society's case was based largely upon the testimony of its two case workers. These witnesses, Mrs. Reiners and Mrs. Haddock, testified that in their earliest contacts with the plaintiffs, when the child was only six months of age, both parents insisted upon removing the child from their home; that from the beginning, the father wanted to make this removal permanent, saying he could never accept the child whom he called "a damned nuisance"; that only twice during the seven months the child was in a foster home did the plaintiffs request to see their child; that neither parent sent their daughter any presents for her birthday, Christmas and other occasions, except possibly a few items of clothing; that the parents left the child's name off their Christmas cards, except where they thought it might be missed by the recipient; that their primary concern seemed to be what to tell friends and parents about their giving up Diane; that Mrs. Lavigne told Mrs. Reiners in March, 1950, that she was quite certain her husband would never change his determination to give up the child permanently; that she had no maternal instincts and did not miss the baby when she was away and chose to keep her husband in preference to her child; that when the surrender agreement was signed, Mrs. Reiners carefully explained the agreement and its finality and irrevocability and that it was understood by them; that in the final interview held with Mrs. Lavigne in September, 1950, the mother expressed no misgivings and regrets, but felt that it was all for the best.
The plaintiff, Joe B. Lavigne, in his testimony, frankly admitted his blameworthy attitude towards his child; that it was caused by "The fact that my wife, after birth of our daughter, was sick in the hospital for three weeks. That, in itself, imposed additional financial burdens upon us, and at the same time, I was studying for my examinations in my last semester of school. We came East, and I had to borrow money from the University that had to be paid back. I had no friends or relatives close. We were all alone, and I became emotionally upset under those circumstances"; that *565 both he and his wife felt they had "made a terrible mistake, and that the child should be with her natural parents" and wanted the child back "to establish a normal relationship between our daughter and ourselves." Mrs. Lavigne's testimony substantially corroborated that of her husband. The plaintiffs denied the testimony of Mrs. Haddock, that at their early interviews Mr. Lavigne wanted the child permanently removed; that their original purpose was merely to provide a foster home until they could solve their problems; that the matter of adoption was not seriously considered by them until May, 1950, after the child had been returned to their home, although Mrs. Haddock had previously mentioned it to them on several occasions and later by Mrs. Reiners in her interviews with Mrs. Lavigne. Mr. Lavigne testified further that "the agency had given us the fact that there was no foster home available and if we felt we couldn't take care of Diane at the present time, there was nothing left to do but put her up for adoption." At the trial, it was developed that Mr. Lavigne was living in California, where he had a teaching position, and other income sufficient to provide a suitable home for their daughter and that he and his wife were so anxious to have the return of their child, they were willing to return to New Jersey and live here if the court decided that such a condition should be imposed; that they had deposited in the bank the sum of $775 to repay the Society for the financial outlay that had been occasioned in boarding their child; that originally, under the then existing circumstances, he had considered the child a burden in that she was an added expense and that that was one of the reasons for his emotional upsets, stating, "I realize now the child should be placed first above everything. I didn't realize that at the time. That is why I am willing to come back to New Jersey to care for Diane as necessary. I will do anything that should be done to take care of Diane and have her with her family again." He testified further that although the language of the assignment agreement was read and understood by him, they thought that after the one-year *566 trial period, they had the privilege of giving the child back or the agency had the privilege of taking the child back; that "we feel that any ties of affection that would be broken would be more than replaced by the natural ties of affection between us and our daughter, Diane, between the natural parents and our own daughter." With respect to the plaintiffs' testimony that they assumed that the surrender agreement was not a finality, Mrs. Reiners, one of the agency's representatives, testified: "I probably told them the first year's placement was a trial; that the agency is still responsible for the welfare of the child in the first year, although normally when a child is placed we are pretty certain it is a good home from the beginning."
The appellants contend that (1) the plaintiffs legally abandoned their child and may not now repent and revoke their surrender; and (2) the parents' past conduct has proven them unfit parents of the child and to return her to them would be contrary to her best welfare. By permission of the court, several family and child welfare societies as amici curiae have filed a joint brief wherein they support the position taken by the Society.
The right of adoption, while known to the ancients of Greece and Rome, and probably to other ancient peoples, and while practised among many of the continental nations under the civil law from the remotest antiquity, was unknown to the common law of England, and exists in this country in those jurisdictions having that law as the basis of their jurisprudence, only by virtue of statute. However, adoption statutes must be construed so as to authorize the adoption of a child by strangers only in cases where the natural parents consent to the adoption, or where the proof shows that the child has been abandoned by its natural parents or that it is manifestly to the interest of the child that it be taken from their custody by some judicial proceeding of which they had notice. 1 Am. Juris., Adoption of Children, secs. 3 and 4, pp. 622, 624. In re Book's Will, 89 N.J. Eq. 509 (Prerog. 1918); reversed on other grounds, *567 90 N.J. Eq. 549 (E. & A. 1919); Elmer v. Wellbrook, 110 N.J. Eq. 15 (Ch. 1932). Statutes authorizing adoption of children, being in derogation of the common law, are to be strictly construed. Gardner v. Hall, 132 N.J. Eq. 64, 68 (Ch. 1942); affirmed 133 N.J. Eq. 287 (E. & A. 1943). In all cases involving the custody of an infant child, the primary consideration is its welfare. Lippincott v. Lippincott, 97 N.J. Eq. 517 (E. & A. 1925); Price v. Sainsot, 103 N.J. Eq. 355 (E. & A. 1928); Ex parte Kirschner, 111 A. 737 (Ch. 1920); In re Moffett, 5 N.J. Super. 82 (App. Div. 1949); Stawicky v. Stawicky, 12 N.J. Super. 72 (App. Div. 1951). However, parents may, by abandonment, lose their right to a child, Winans v. Luppie, 47 N.J. Eq. 302 (E. & A. 1890); Richards v. Collins, 45 N.J. Eq. 283 (E. & A. 1889). The purpose of abandonment may be repented of, and in proper cases all parental rights again acquired, including the statutory right of preventing adoption by withholding consent. Winans v. Luppie, supra. Normally, the parents of a legitimate child are entitled against all others to its custody, unless it is shown they are unfit. Ziezel v. Hutchinson, 91 N.J. Eq. 325 (E. & A. 1920); Price v. Sainsot, supra.
At the outset of our discussion, we point out that the issue should be decided not upon the basis of any emotional appeal but rather on the law and the facts.
Under point (1), the Society argues that the proofs establish that the plaintiffs legally abandoned their child and consequently may not now repent and revoke their surrender to regain her custody. Based upon a thorough research of the cases in this and other states, it is clear  and it is so conceded by the parties  that the factual question of abandonment must be determined by ascertaining the mental attitude and intent of the parents; and, further, that assuming an abandonment has taken place, the primary factor in determining the future custody of the child is its welfare and what will promote its best interests. The leading case in *568 New Jersey relied upon by the Society is that of Winans v. Luppie, supra, wherein the court held:
"The statutory notion of abandonment does not necessarily, we think, imply that the parent has deserted the child, or even ceased to feel any concern for its interests. It fairly may, and in our judgment does, import any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child. * * * It does not follow that the purpose may not be repented of, and in proper cases all parental rights again acquired, including this statutory right of preventing adoption by withholding consent; but, when once the abandonment is shown to have existed, it becomes a judicial question whether it really has been terminated, or can be, consistently with the welfare of the child. When, in pursuance perhaps of the abandonment, new ties have been formed and a new station in life has been taken by the child, it might be unjust, that, solely because of the parent's caprice, legal sanction should be refused to the new conditions."
At this juncture, we will not engage upon a discussion of the Society's contention that the agreement of surrender is irrevocable. Of course, the surrender agreement is an important factor in determining the question of legal abandonment. However, we are convinced that under the cases, the court may, under persuasive proofs, determine that, notwithstanding the abandonment, the best interests of the child will be promoted by awarding custody to the natural parents. In the case sub judice, the child had been in the custody of the adoptive parents for approximately 8 1/2 months when the plaintiffs made their demand for restoration of custody. She was only 15 months of age at the time she was surrendered to the Society and at the time of the institution of this suit, was only 2 years and 3 months old. It is difficult to see the force of the Society's argument that the child had formed new and permanent ties of affection and assumed a new station in life, as was held in Winans v. Luppie, supra. In that case, the child was less than a year old when she was permitted to remain in the Winans' home where she lived for five years, then returned to her mother for several months, following which she returned to the Winans' home and remained there until she was ten years of age. Similarly, *569 in the case of In re Hazuka's Adoption, 345 Pa. 432, 29 A.2d 88 (Sup. Ct. 1942), cited by the Society, where it was held that abandonment may occur in a number of ways and may be effected by a formal legal instrument or merely by conduct, evincing a settled purpose to forego all parental duties and relinquish all parental claims, and that it is largely a matter of intention to be ascertained from the circumstances and whether or not a child has been abandoned is a question of fact. The court there held that:
"* * * While abandonment is not necessarily irretrievable, and in proper cases the rights and obligations previously renounced may be resumed, it is also true, as said in Winans v. Luppie, 47 N.J. Eq. 302, 304, 20 A. 969, 970, cited in Weinbach's Appeal, 316 Pa. 333, 339, 175 A. 500, 502, that: `When, in pursuance, perhaps, of the abandonment, new ties have been formed, and a new station in life has been taken by the child, it might be unjust that, solely because of the parent's caprice, legal sanction should be refused to the new conditions.'"
In Warnecke v. Lane, 75 A. 233 (N.J. Ch. 1910), where two children had been placed with their grandparents since birth, and at the time of their father's application for restoration they were five and eight years respectively, the father's application being denied partly because of his immoral character, notwithstanding which he was granted a right of visitation and the right to renew his application at an appropriate time. In Price v. Sainsot, supra, the child was seven years of age at the time the application for custody was made and had been abandoned for seven years. In Wood v. Wood, 77 N.J. Eq. 593 (E. & A. 1910), the child was 12 years of age at the time application for custody was made; in Richards v. Collins, supra, the child had been given to the care of Mrs. Richards at birth and remained with her until she was 12 years old, at which time the court refused to restore custody to the parents, but reserved a right of visitation and to renew the application. We find no applicability to the case of In re Moffett, supra, relied upon by the Society, for the reason that the only ground considered was the *570 question whether under R.S. 9:3-1 the natural parents could legally and voluntarily place their child for adoption with some fit person as an adopting parent. The case of Ziezel v. Hutchinson, supra, has some pertinency. In that case, the child for whose custody the father made application had been left in the home of the maternal grandparents for two days before the death of the child's mother, at which time the father, a young man without means, gave the grandmother an oral promise to leave the child with her permanently. Thereafter he did not support her and, when he became a United States Naval surgeon, remarried, established a home and after a lapse of three years time, demanded the return of the child. The court held that in the absence of parental unfitness, he was entitled to her custody, stating:
"* * * while we agree with the conclusion of the learned advisory master that the child must be awarded to the father, as her legal custodian, upon the familiar rule of law to which we have adverted, and which has received practical application in the courts of this state in the following adjudications: Baird v. Baird, 18 N.J. Eq. 194; Landis v. Landis, 39 N.J.L. 274; Luppie v. Winans, 37 N.J. Eq. 245. * * * in the absence of satisfactory proof of parental unfitness, the child, in compliance with the inexorable legal mandate, must be awarded to her father. Bennet v. Bennet, 13 N.J. Eq. 114; Magee v. Holland, 27 N.J.L. 86, 72 Am. Dec. 341; Morris v. Wardell (Sup.) 67 A. 850."
Cf. French v. Catholic Community League, 69 Ohio App. 442, 44 N.E.2d 113 (Ct. of Apps. 1942).
The Society and amici curiae urge upon us the great importance of upholding the surrender agreement and they point out the serious consequences that may ensue if it is set aside; further, they contend that a surrender is in some respects similar in status to a consent for adoption, but, in tenor and inherent implications, it is a far more grave and far more reaching step. No reported New Jersey case involving a surrender is cited. Nor have we in our research been able to discover any. The reported New Jersey cases deal mostly with some oral or written promise of varying formality to grandparents or other relatives of the child. *571 The Society and the amici curiae advert to the New Jersey decisions holding that the parents' rights to their child's custody may be transferred or abandoned, citing Gardner v. Hall, supra, and Ex parte Kirschner, supra. They lay great stress upon the decisions of the courts of the State of New York. Contrary to our State, where there does not appear to be any specific legislation providing for the method and mechanics for the execution of instruments of surrender of infants (except to the State Board of Child Welfare, R.S. 30:4C-23; L. 1951, c. 138, p. 584, sec. 23), the Legislature of New York has adopted such a statute. See Social Welfare Law, sections 371, 374, 383, 384; Domestic Relations Law, sections 109, 113 (N.Y.). It is significant that in R.S. 30:4C-23, supra, the following language is used:
"Such surrenders, releases and consents, when properly acknowledged in the manner and form as provided by section 46:14-6 of the Revised Statutes, shall be valid and binding irrespective of the age of the person giving the same, and shall be irrevocable except at the discretion of the State Board of Child Welfare or upon order of a court of competent jurisdiction."
Notwithstanding New Jersey's failure to adopt any specific legislation for surrender of infants to an approved agency, such an agency or society may, if it takes the custody of a child upon the execution of a written surrender to it by the parents for placement in a suitable home for adoption, give its consent to the adoption in lieu of the parents' consent. R.S. 9:3-4 (f), as amended, L. 1944, c. 239, p. 797, sec. 2; L. 1951, c. 104, p. 509, sec. 1. The statutory references to approved agencies are silent on the question of the irrevocability of such surrender agreements.
In support of their contention, the Society and the amici curiae cite and discuss the following cases: People v. Commissioner of Welfare, 70 N.Y.S.2d 389, 188 Misc. 919 (N.Y. Sup. Ct. 1947); People v. Free Synagogue Child Adoption Committee, 85 N.Y.S.2d 541 (N.Y. Sup. Ct. 1949); People v. Aldrich, 99 N.Y.S.2d 913 (N.Y. Sup. *572 Ct. 1950); People ex rel. Anonymous v. Rebecca Talbot Perkins Adoption Soc., 68 N.Y.S.2d 238 (N.Y. Sup. Ct. App. Div. 1946); In re Hazuka's Adoption, supra; Appeal of Weinbach, 316 Pa. 333, 175 A. 500 (Pa. Sup. Ct. 1934); Wyness v. Crowley, 198 N.E. 758 (Sup. Jud. Ct. Mass. 1935), and cases from other states. We find that while in most of these cases, the abandonment of the child by its parents was concluded against them, there was a holding that the abandonment and the surrender agreement did not possess such a character of finality that precluded the court from considering and determining that it might be set aside and the custody of the child restored to its parents, if the facts supported the premise that they were fit persons and the best interests of the child would be promoted thereby; in fact, in those cases the decision almost invariably turned on the issue of the welfare of the child, and the denial of the restoration of the child's custody to the parents was based upon their unfitness and the best interests of the child. For instance, in the case of People v. Free Synagogue Child Adoption Committee, supra, where the surrender of the child to an authorized agency for adoption was upheld, the court held:
"The Social Welfare Law nowhere endows surrender to an agency, in so far as custody prior to adoption is concerned, with irrevocability or expressly with less limitations than surrender to an individual. In fact, section 383, subdivision 1, provides that `The parent of a child remanded or committed to an authorized agency shall not be entitled to the custody thereof, except * * * in pursuance of an order of a court or judicial officer of competent jurisdiction, determining that the interest of such child will be promoted thereby and that such parent is fit, competent and able to duly maintain, support and educate such child.'
It is thus apparent that the legislature has gone to great pains to circumscribe, in connection with adoption, the rights of parents who have surrendered their child to an authorized agency, and that it has gone to equal pains to define their rights to custody prior to adoption. (Italics ours.) The related statutes, which are at least presumptively an embodiment of the social judgment and conscience of the community, form a well-integrated, compact and uncomplicated procedure, which bears the impress of careful thought and intelligent planning. In short, it would appear that the legislature has *573 decided that every measure must be taken to render a consummated adoption unassailable; also, to protect at all times the repute of the adoptive agency and the evolving status of the prospective foster parents. In this latter regard, however, the legislature did not shut the agency doors forever, prior to adoption, to a `fit, competent' parent, `able to duly maintain, support and educate' her child, who after the impact of physical separation suffered a change of heart and desired to recapture custody. This legislative concern accounts for the statutory provision that `The name of such child shall not be changed while in the custody of an authorized agency.' Section 383, subd. 1, Social Welfare Law."
See In re Adoption of Susko, 363 Pa. 78, 69 A.2d 132 (Sup. Ct. 1949); Kalika v. Munro, 83 N.E.2d 173 (Mass. Sup. Jud. Ct. 1948); French v. Catholic Community League, supra; Petition of Dickholtz, 341 Ill. App. 400, 94 N.E.2d 89 (App. Ct. Ill. 1950). In In re Schult, 14 N.J. Super. 587 (Hudson Cty. Ct. 1951), which dealt with the withdrawal of parental consent prior to judicial action for adoption, the court held that a natural mother can withdraw her consent if her change of mind and demand for the return of her child are timely. In the case of In re Adoption of Anonymous, 101 N.Y.S.2d 93, 198 Misc. 185 (N.Y. Delaware Cty. Ct. 1950), the court, discussing the apparent conflict of authorities on the question of the irrevocability of consent and surrender, stated:
"* * * We conclude that the right of revocation depends on all of the circumstances of a particular case, including such a variety of factors as the financial and physical condition of the mother, her previous mode of life, the circumstances under which the consent was given, the length of time elapsing, the conduct of the parties between the giving of the consent and the attempted withdrawal, and their subsequent conduct, the success or failure of the foster parents in their new venture, their losses in relying upon a possibly ineffective consent, and any other circumstances which might aid the court to solve a difficult problem."
In the case of People v. Rebecca Talbot Perkins Adoption Soc., supra, the court held:
"Upon commitment of the child to an authorized agency a parent shall not be entitled to custody except upon consent of the court or public authority responsible for the commitment `or in pursuance of *574 an order of a court or judicial officer of competent jurisdiction, determining that the interest of such child will be promoted thereby and that such parent is fit, competent and able to duly maintain, support and educate such child.' Social Welfare Law, § 383, subd. 1.
The only issue here is whether the best interests of the child would be promoted, in accordance with the statutory language, or even under the parens patriae doctrine, by returning the child to respondent."
See also People v. Convent of Sisters of Mercy in Brooklyn, 104 N.Y.S.2d 939 (N.Y. Sup. Ct. 1951). The following cases from other states also adhere to the well established rule that the primary and paramount concern of the court is for the welfare and best interests of the child. In re Davies' Adoption, 46 A.2d 252, 258 (Pa. Sup. Ct. 1946); In re Adoption of Anonymous, supra; People v. Aldrich, supra; People v. Commissioner of Welfare, supra; French v. Catholic Community League, supra; Petition of Dickholtz, supra. See also Stawicky v. Stawicky, supra; In re Diana, 165 Pa. Super. 12, 67 A.2d 751 (1949).
The differences between the parties here are based upon their contrary views of the conduct of the plaintiffs and their fitness to have the custody of their child. Unfortunately, the adopting parents are not parties to this action and there is no testimony as to who they are, their financial position, the kind of home they maintain, what attachments, if any, have been formed, and other factors which are important to this issue. In the absence of such testimony we are unable to make any comparisons. However, we are not passing upon the failure to join the adopting parents as parties, as that issue has not been raised. On the question of the parents' fitness, two psychiatrists testified, one for the plaintiffs and one for the defendant. The plaintiffs' psychiatrist, Dr. Baruch, who examined both plaintiffs, testified that in his opinion. Mr. Lavigne showed that he had at one time suffered from what we call "a mild or moderately severe form of character neurosis, at the time his wife was pregnant and after the child was born." Dr. Bernstein, who did not see the plaintiffs, testified for the Society solely on the basis of *575 hypothetical questions, that such a parent was "either psychotic or suffering from a deep-seated character neurosis, a deep-seated character disorder." Dr. Baruch stated further that, in his opinion and bearing the welfare of the child in mind, the plaintiffs, at the time of the trial were entirely fit parents to have the child and the interests of the child would be promoted by returning custody of her to them. In addition, the advisory master had the opportunity of seeing and observing the plaintiffs and held that they were fit and proper persons to have the custody of their child. See Giffin v. Gascoigne, 60 N.J. Eq. 256 (Ch. 1900); Ex parte Kirschner, supra.
We are not impressed with the argument that by reason of the attachments made by the child with the adoptive parents her best interests will be impaired or jeopardized by restoring custody to the natural parents. There is no evidence that the several changes that have taken place in the child's life since its birth, namely, the parents' custody for approximately six months, then in the custody of the Society and the foster home, the return of the child to the parents for two months, and subsequently, the custody of the adopting parents, have in any way affected the child's health or well-being. Considering the age of the child, it is difficult for us to believe that such permanent attachments have now been formed that cannot be broken without impairing the child's health and well-being. We do not question the sincerity and good faith of the Society and the amici curiae. Undoubtedly, they are organized for and devoted to a most worthy objective and are to be highly commended for the character of their voluntary service and splendid contributions in behalf of the unwanted children of New Jersey. However, we think they will agree that in this case, as in similar cases, the issue should be determined not upon the enforcement of a harsh rule that a written surrender is irrevocable, but upon the basis of the best interests of the child. As stated in People v. Convent of Sisters of Mercy in Brooklyn, supra, at p. 945:
*576 "The placement system in these particular proceedings must yield to the welfare of the individual child. This Court refuses to sacrifice this infant's interests because of a claim that the interests of children, not before the Court, will be affected by a possible impairment of a placement system, nor is the fact that the result reached may be operative as a precedent in future cases of any great moment. Each case will require an approach with respect to the facts therein presented and weighed accordingly. In other cases there may well be lacking the fact here presented of permitting an infant of the age of 6 months to remain in a boarding home for 4 years with the resultant attachment of the child for the boarding parents. The importance of this fact is exemplified by the testimony of the parish priest as follows: `The Witness: For every rule there is always an exception of some kind, and in this particular case I felt it was a terrible injustice to the child to take that child out of those surroundings, especially when they have had it so long.'

* * * * * * * *
These statutes, however, do not and cannot affect the equitable powers of the court to arrange for custody with a view to the best interests of the child. This power is inherent in the Supreme Court and may not be abrogated by statute. People ex rel. Riesner v. New York Nursery & Child's Hospital, supra, 230 N.Y. at page 124, 129 N.E. at page 343; Walch v. Walch, supra; People v. Riley, 188 Misc. 969, 64 N.Y.S.2d 348, 353."
As an indication of the lack of finality to a surrender agreement, it must be conceded that during the probationary period of one year (six months if approved by the court) before adoption proceedings can be instituted, the Society may remove the child from the adopting parents or the adopting parents may return the child to the Society and the "adoption" court may, notwithstanding the surrender agreement and the probationary period of one year, decide that the best interests of the child will not be promoted by permitting the child to be adopted by the persons who have had its custody for the required period of time.
We reach the conclusion that under all the circumstances, having in mind the difficulties with which these young people were faced at the outset of their married life and the abnormal emotional conditions created thereby, the future embarrassment that may come to their daughter, either early or later in life, when she may discover that she is an adopted child, the absence of proof concerning the *577 adopting parents, and it clearly appearing that the plaintiffs are fit and proper persons to have their child, that their present economic situation is sufficiently established to provide a suitable home for her, and to the end that she may be reared in the atmosphere and the guidance of her natural parents, her best interests demand that she be returned to their custody.
We are of the opinion that the revocation of a written surrender agreement made with an approved agency, should only be considered and determined prior to the judicial consummation of the adoption proceedings, and then only on the basis of the court's finding that, under all the circumstances, it is for the best interests of the child.
The judgment of the Chancery Division is affirmed, without costs.